**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                              No. 95-5207

KITTRELL BERNARD DECATOR,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                              No. 95-5208

CRAIG LAMONT SCOTT,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Frank A. Kaufman, Senior District Judge.
(CR-94-281-K)

Argued: November 1, 1996

Decided: December 11, 1997

Before ERVIN, Circuit Judge, BOYLE, Chief United States District
Judge for the Eastern District of North Carolina, sitting by
designation, and JACKSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished opinion. Chief Judge Boyle wrote the
majority opinion, in which Judge Ervin joined. Judge Jackson wrote
a dissenting opinion.

**COUNSEL**

**ARGUED:** Michael J. Moran, Towson, Maryland, for Appellant Decator; Raymond D. Kline, Alexandria, Virginia, for Appellant Scott. James G. Warwick, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

BOYLE, Chief District Judge:

Kittrell Bernard Decator and Craig Lamont Scott appeal their convictions for bank robbery on the grounds that the district court improperly denied various motions to suppress physical evidence. Because we find no error in the district court's denial of the suppression motions, the judgments of conviction are affirmed.

I

On June 8, 1994, at approximately 10:15 a.m., federal and county law enforcement officers learned of a robbery in progress at Maryland National Bank in Baltimore County, Maryland. By the time officers arrived at the bank, the robbers had fled the scene.

In the course of interviewing bank employees and customers who had witnessed the crime, officers learned that two men, one of whom was noticeably taller and larger than the other, had entered the bank wearing dark face masks, or hoods, with oval-shaped openings around the eyes. One of the men was wearing a sweatshirt with a "cross-oar" design emblazoned on the front, and both men were wearing white, rubber gloves, and carrying what witnesses described as "machine pistols."

2

During the course of the robbery, the two men reportedly disarmed a security guard of his .357 magnum revolver, and then ordered bank employees to open the bank's vault and fill a grey duffel bag with money. Bank employees told investigating officers that some of the money that was placed in the grey duffel bag contained security dye packs, which explode upon detonation and stain anything in the vicinity a dark red color.

According to witnesses, when the two men left the bank, red smoke began trailing from a bag that one of them carried, suggesting that a dye pack had exploded. The two men then jumped into a dark Toyota pickup truck, and drove away from the scene. Some witnesses reported seeing a third male, and possibly a fourth, in the pickup truck as it drove away.

One witness followed the pickup truck and recorded the license plate number. The officers at the scene traced the license number, and learned that the truck belonged to Kittrell Bernard Decator, twenty-three (23) years of age. Baltimore Gas and Electric Company records disclosed that Decator's current address was 2348 Eutaw Place, in Baltimore City, Maryland.

On the basis of the above information, law enforcement officers set up surveillance in the vicinity of 2348 Eutaw Place at approximately 12:30 p.m. that afternoon. At 3:20 p.m., officers saw a dark green Toyota Camry driven by a young male drive slowly down the alley to the rear of 2348 Eutaw Place. The driver slowly backed the Camry into a parking pad near the rear of 2348 Eutaw Place, at which point the Camry was no longer in the view of the surveilling officers. About ten minutes later, the Camry pulled out of the parking pad and began to drive down the alley, and surveilling officers saw that there was now a second male, heavier in build than the driver, sitting in the passenger seat.

Detectives Ballard and Palmier, both of whom, from opposite ends of the alley, had watched the Camry drive down the alley and enter the parking pad, stopped the Camry as it now attempted to drive away. Ballard pulled his car in front of the Camry to block its path, and Palmier approached the Camry on foot. According to Ballard, the reason he blocked the Camry's path was to "check out the possibility

3

that this may be the individual who robbed the bank." The detectives immediately identified themselves as police officers, requested that the occupants of the car keep their hands in view, and then asked the two occupants of the car for identification. The driver of the car produced a Maryland driver's license that bore the name Kittrell Decator, and the man in the passenger seat produced identification indicating that he was Jonathan Mark Jones. Decator told Detective Ballard that the Camry was a rental car and that he had taken his truck to a repair shop earlier in the day.

Upon learning that Decator, the registered owner of the getaway truck used in that morning's bank robbery, was an occupant of the Camry, the detectives asked both occupants to step out of the car. Other agents conducting surveillance in the vicinity of 2348 Eutaw Place were summoned to the location where the Camry had been stopped. The detectives noted that the man who had been sitting in the passenger seat, Jones, was taller and heavier than Decator, which matched the physical description of the two men who had robbed the bank earlier that day. Decator and Jones were patted down for weapons, and, none having been found, the two men were then asked to step away from each other so that each could be independently interviewed. The two men were neither handcuffed nor informed that they were under arrest.

Detective Kenneth Ziegler of the Baltimore County Police Department asked Decator to accompany him to Ziegler's car. The two did not enter Ziegler's car, but remained standing in front of it. Detective Ziegler told Decator that he had some questions about Decator's truck, but before asking Decator any specific question, Detective Ziegler apprised Decator of his Miranda rights, and informed Decator that he was not under arrest. At the suppression hearing, Detective Ziegler testified that Decator acknowledged that he understood his Miranda rights, and consented to be questioned.

Detective Ziegler asked Decator where his pickup truck was, and Decator responded that his truck had been stolen earlier that day. This story was inconsistent with Decator's earlier claim that his truck was in the repair shop.

Shortly after Detective Ziegler began to question Decator, dye-stained, white surgical gloves were discovered on the parking pad of

4

2348 Eutaw Place. The gloves matched the description of the gloves worn by the two bank robbers, and the dark red dye on the gloves appeared to have originated from an exploding dye pack.

At this point, law enforcement officers informed Decator and Jones that they were under arrest. The car that Decator was driving at the time of his arrest was later towed to police headquarters and searched for evidence from the bank robbery. Inside the trunk was a backpack. It contained two .9 mm handguns with fully loaded magazines, a loaded .357 magnum revolver, a box of latex surgical gloves, two black nylon face masks, and a sweatshirt with a"cross-oar" design emblazoned on the front.

At the time of his arrest, Decator was wearing a digital pager on his waist, which was seized by the officers. Detective Ziegler accessed the pager's memory and discovered that Decator had recently received several calls, all of which were from the same phone number. The number was traced back to the switchboard of the Howard Johnson Motel on Route 40 in Baltimore County. Since law enforcement officers could not determine the specific motel room from which the call was made, surveillance was set up around the perimeter of the motel, with especially close attention paid to the side exits and rear entrance.

As two agents spoke with the clerk at the front desk of the motel, officers watching the rear entrance of the motel observed a young male, who later turned out to be Craig Lamont Scott, leave the rear entrance carrying a grey, overstuffed, athletic bag. As the young man walked away from the motel, he walked directly past Agent Dougher, whose gun holster, and badge, were plainly in view. The young man looked at Agent Dougher, smiled, and kept on walking. When Agent Dougher learned from fellow officers that the young man had just exited the rear entrance of the motel, Dougher called out and whistled for Scott to stop. Scott ignored Agent Dougher and continued walking, towards and across Route 40, a congested road, and into Westview Shopping Mall. Agent Dougher, placing his gun and badge out of view in order not to alarm the mall's patrons, followed Scott inside the mall. Agent Dougher located Scott and waited for him to finish making a call at a pay phone. Agent Dougher then approached Scott and identified himself as an FBI agent and asked to speak with him.

5

Scott asked Agent Dougher where his badge was and pointed to the agent's left breast pocket. Agent Dougher, fearful that Scott might be carrying a weapon, either on his person or in the athletic bag he was holding, asked Scott to put the bag on the ground. Instead of complying, Scott turned and started to run. Agent Dougher rushed forward and grabbed Scott by the arm, at which point Scott proceeded to strike Agent Dougher in the head with the duffel bag. The duffel bag fell out of Scott's hand, and Scott managed to free himself from Dougher's grasp. Agent Dougher then chased Scott into Marshall's department store and eventually caught up with him. A struggle ensued. Scott once again freed himself from Dougher's grasp, but was soon apprehended by a store security guard.

Detective Folio, who had followed Agent Dougher into the shopping mall, and who had witnessed, from afar, Scott hurl the duffel bag at Agent Dougher's head, recovered Scott's abandoned duffel bag from the floor of the mall. Suspecting that there might be a loaded weapon inside the bag, Detective Folio opened the bag and examined the contents. The bag contained approximately $113,000.00 in United States currency. Detective Folio also discovered, resting on the floor of the mall next to Scott's grey duffel bag, a blue plastic bag containing money wrappers and money bands from the Maryland National Bank.

Scott was arrested for assault on a federal officer and for bank robbery. Officers searched his person and found a key to room 504 of the Howard Johnson Motel. Since witnesses to the bank robbery had reported seeing as many as four men in the pickup truck as it drove away, law enforcement officers believed that an additional suspect might still be at large, and thus entered Room 504 without first obtaining a warrant. They conducted a cursory search, and finding no other person in the room, they secured the room until a search warrant could be obtained.* Upon obtaining a warrant to search Scott's hotel

_____

*Detective Folio testified during the suppression hearing that the search warrant application, which he assisted in filling out, was based solely on information obtained independently of the initial, warrantless search of the hotel room. According to Folio, the detectives who filled out the search warrant application had received "no information at all" from the officers who made the initial entry.

6

room, officers discovered Scott's fingerprints on the telephone, and dye-stained towels.

Decator and Scott were indicted for the armed robbery of Maryland National Bank which took place on June 8, 1994. The defendants entered pleas of not guilty and filed motions to suppress physical evidence. The motions to suppress physical evidence were denied by the district court.

On November 15, 1994, Appellants Decator and Scott were convicted by a jury of the June 8, 1994, robbery of Maryland National Bank, and of using and carrying a firearm in a crime of violence. On February 24, 1995, the trial court sentenced both Decator and Scott to terms of 12 years and three months.

Decator and Scott now appeal their convictions, arguing that the district court erred in denying their motions to suppress physical evidence. Appellants argue that the district court erred in (i) concluding that law enforcement officers were constitutionally justified in stopping the Toyota Camry; (ii) concluding that Decator knowingly, voluntarily, and intelligently waived his Miranda rights; (iii) concluding that the warrantless search of the trunk of the Camry was supported by probable cause; and (iv) concluding that the stop and searches relating to Scott were reasonable or otherwise subject to an exception to the warrant requirements. Appellants also argue that all evidence seized from Scott was tainted and inadmissible, since the officers were only able to locate Scott by making use of evidence obtained unlawfully from Decator. Finally, Appellant Scott argues that the district court treated his counsel so unreasonably during the suppression hearing that she was rendered ineffective.

II

In evaluating the district court's denials of the various suppression motions, we review the district court's legal conclusions de novo and its factual findings for clear error. United States v. Williams, 10 F.3d 1070 (4th Cir. 1993).

A

Appellants' first argument is that the district court erred in concluding that Detectives Palmier and Ballard were constitutionally justified

7

in stopping the Toyota Camry that was driving away from 2348 Eutaw Place.

Under the Fourth Amendment, a brief, investigatory, warrantless stop of an automobile is permissible if an officer has a reasonable suspicion, based on specific and articulable facts, that the occupants of the car have committed a crime. Terry v. Ohio , 392 U.S. 1 (1968); Delaware v. Prouse, 440 U.S. 648 (1979). As long as the investigatory stop is reasonably related in scope to the circumstances which justified the interference, the stop is constitutionally permissible. United States v. Sharpe, 470 U.S. 675, 682 (1985).

Here, the reason that Detectives Palmier and Ballard suspected that the occupants of the Toyota Camry might have committed the robbery of Maryland National Bank is because the Camry had recently arrived at, and was now attempting to drive away from, 2348 Eutaw Place, the address to which the license plate of the bank robbers' getaway truck had been traced. It was not unreasonable for law enforcement officers to assume that the registered owner of the getaway truck, Decator, might have been involved in the bank robbery, and that Decator was either the driver of the Camry that pulled up to Decator's residence, or the man in the passenger seat who had just been picked up.

Appellants argue that since Detectives Palmier and Ballard were unable to verify, prior to stopping the Camry, whether or not either occupant of the Camry was wearing white, latex gloves, or a sweatshirt with a "cross-oar" design emblazoned on the front, or a dark face mask with oval-shaped openings around the eyes, the officers did not have a constitutionally sufficient basis upon which to assume that the occupants of the Camry had committed the robbery in question.

But Terry and its progeny require only that law enforcement officers possess a reasonable, specific, articulable  basis that a suspect has committed a crime, not incontrovertible proof that a suspect is guilty. Here, the fact that the Camry was driving away from 2348 Eutaw Place, the home of a suspected bank robber, was a sufficient basis, in itself, for the officers' suspicion.

8

Since the stop of Decator and Jones was not unreasonably intrusive under the Fourth Amendment, the district court did not err in denying Decator's motion to suppress evidence of the arrest, and in denying Decator's motion to suppress tangible evidence taken from Decator's person, and from the trunk of the car.

B

Appellants' second argument is that there was not sufficient evidence presented at the suppression hearing upon which the district court could have reasonably concluded that Decator waived his Fifth Amendment protection against self-incrimination. Therefore, appellants argue, the district court should have suppressed Decator's statement to Detective Ziegler that his truck had been stolen, which contradicted Decator's earlier statement to law enforcement officers that his truck was in the repair shop.

There is no dispute between the parties that Decator was effectively in custody when Detective Ziegler began to question him about the whereabouts of his truck. Nor is there any dispute that Detective Ziegler's Miranda warning sufficiently apprised Decator of his rights. The only issue in dispute is whether Detective Ziegler's testimony at the suppression hearing established, by a preponderance of the evidence, that Decator's waiver of his Miranda rights was knowing, voluntary, and willful. See Colorado v. Connelly, 479 U.S. 157, 168 (1986); Miranda v. Arizona, 384 U.S. 436 (1966).

Detective Ziegler testified at the suppression hearing that after verbally apprising Decator of his Miranda rights, Decator "did not ask for an attorney and he said, you know, it'd be okay to talk to him. I forget the exact terminology he used, but that was his indication." The district court concluded that Detective Ziegler's testimony was truthful, and there is nothing in the Record to suggest that the district court's conclusion as to Ziegler's credibility was clearly erroneous. But the appellants argue that even accepting that Ziegler's testimony is true, the manner in which Decator responded to Ziegler's Miranda warning suggests "equivocation," not a knowing, voluntary, and willful waiver of his rights.

The problem with appellants' argument is that Detective Ziegler's testimony is unequivocal, and thus not open to interpretation. Detec-

9

tive Ziegler testified that although he could not recall the precise language Decator used, it was perfectly clear to Ziegler that Decator was cognizant of his legal rights, and that, nonetheless, it was okay for Ziegler to ask him questions. Since the only rational interpretation of Ziegler's testimony is that Decator knowingly, voluntarily, and intelligently waived his Miranda rights, the district court's conclusion to that effect was not in error.

C

Appellants' third argument is that the district court erred in concluding that law enforcement officers were constitutionally justified in opening the trunk of the Toyota Camry without a warrant, and then searching the contents of the backpack found within it.

In United States v. Ross, 456 U.S. 798 (1982), the Supreme Court held that if law enforcement officers have probable cause to believe that there is contraband, or evidence of criminal activity, somewhere inside an automobile, it is constitutionally permissible, under the Fourth Amendment, to search the automobile without a warrant. Since the "scope of the warrantless search [of an automobile] based on probable cause is no narrower -- and no broader-- than the scope of a search authorized by a warrant supported by probable cause," id. at 823, even closed containers (such as backpacks found within the trunk of the car) may also be opened and searched without a warrant, as long as there is probable cause to believe that the container contains contraband or evidence of a crime. Id., at 823-24. "The scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted," but "by the object of the search and the places in which there is probable cause to believe that it may be found," id. at 824.

Here, appellants' contention that law enforcement officers lacked probable cause to believe that the trunk of the Camry might contain contraband, or evidence of criminal activity, is without merit. While it is true, as appellants argue, that "the Toyota Camry did not match the description of the truck witnesses had observed leaving the area of the Maryland National Bank on the morning of 8 June 1994," and that "[t]he license plate of the truck and the license plate of the [Camry] were different," it is also true that the driver of the Toyota

10

Camry was the registered owner of the robbers' getaway truck, and that dye-stained, white, latex, surgical gloves were found on the floor of the parking pad from which the Camry had just departed.

Since law enforcement officers had probable cause to believe that the trunk of the Camry might contain further evidence of Decator's involvement in the robbery of Maryland National Bank, they were constitutionally justified in opening the trunk, as well as the backpack inside it, without a warrant. See United States v. Ross, 456 U.S. 798 (1982); Arkansas v. Sanders, 442 U.S. 753, 760 (1979).

D

Appellants' fourth argument is that the district court erred in concluding (i) that Agent Dougher was justified in stopping Scott; (ii) that Detective Folio was justified in making a warrantless search of Scott's duffel bag; and (iii) that law enforcement officers were justified in making a brief, warrantless search of Scott's motel room.

1. Agent Dougher's Decision to Stop Scott

According to appellants, "[t]he Record . . . reflects that, as with the Decator [stop], the stop [of Scott] appeared to be based on consideration of racial appearance alone." In making this contention, appellants mischaracterize the nature of the evidence presented at the suppression hearing. Law enforcement officers were surveilling the perimeter of the Howard Johnson Motel on Route 40 because Decator, a likely participant in that morning's bank robbery, had recently received several phone calls, possibly from an accomplice, that originated from one of the rooms in the Howard Johnson Motel on Route 40. When Scott exited the back entrance of the Howard Johnson Motel on Route 40, officers observed that he was carrying a grey, overstuffed, athletic bag, which matched the description of the grey, money-filled duffel bag that the bank robbers were reportedly carrying when they left Maryland National Bank. When Agent Dougher confronted Scott inside the mall, and requested that Scott put the duffel bag on the ground, Agent Dougher's suspicion that Scott might have participated in the bank robbery became all the more reasonable when Scott ignored his request, hit him in the face with the bag, and then attempted to flee.

11

## 2. Detective Folio's Search of Scott's Duffel Bag

Detective Folio testified during the suppression hearing that when he entered the shopping mall, and saw Agent Dougher tackling Scott to the ground, "everything was happening so fast. Arms were flying, feet were flying, bags were flying, coat racks were flying, coats were flying."

Scott's grey duffel bag was also flying, first towards Agent Dougher's head, and then onwards, eventually landing on the floor of the mall. Before Detective Folio could rush to Agent Dougher's assistance, Dougher and Scott were off and running on a chase through Marshall's department store.

The circumstances facing Detective Folio were as follows: a man suspected of participating in an armed bank robbery had just hurled a duffel bag into a mall full of bystanders, and Agent Dougher, who was chasing the suspect, might need assistance in the near future. Fearing that the duffel bag might contain a loaded weapon, and that he could easily lose possession of the bag in the midst of such confusion, Detective Folio decided to quickly examine the bag's contents. When asked during the suppression hearing why he didn't first obtain a warrant before checking the contents of the bag, Folio responded, "I didn't think there was a need for a search warrant, Your Honor . . . public safety was involved."

We agree. Detective Folio's decision to quickly check the bag's contents, in order to ensure that the bag did not contain loaded "machine pistols," or the security guard's loaded .357 magnum, was certainly within the "exigent circumstances" exception to the Fourth Amendment's prohibition of unreasonable searches and seizures. See, e.g., Cady v. Dombrowski, 413 U.S. 433, 442, 446 (1973) ("to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands," police officer was constitutionally justified in opening the trunk of a seized car without a warrant).

## 3. The Search of Scott's Motel Room

When law enforcement officers initially entered Scott's motel room without a warrant, they did so only to quickly verify that a possible

12

fourth suspect was not hiding there, and the officers did not look for, nor accidentally discover, any tangible evidence that could have been the basis of a motion to suppress. After discovering that the room was empty, officers secured the premises until a warrant could be obtained. According to Detective Folio, who assisted in filling out the application for a search warrant, the application contained no information whatsoever that resulted from the initial entry, and so the evidence ultimately discovered in the hotel room was not tainted in any way by the initial, warrantless search of the room. Even assuming, solely for the sake of argument, that law enforcement officers searching for a fourth suspect were constitutionally obliged to wait outside the hotel room until first obtaining a search warrant, since the evidence ultimately seized from the hotel room was discovered pursuant to a valid warrant obtained independently of the initial search, the evidence was therefore admissible, and the district court did not err in denying the motion to suppress it. See United States v. Curtis, 931 F.2d 1011, 1013 (4th Cir. 1991), cert. denied, 502 U.S. 881 (1991).

E

Appellants' fifth argument is that all evidence derived from the seizure of Decator's beeper -- the arrest of Scott, and the contents of the duffel bag and hotel room -- was tainted, and therefore should have been suppressed, since the initial stop of Decator, which led to the seizure of the beeper, was unlawful. But since we have already determined that the initial stop of Decator was constitutionally permissible, appellants' fifth argument is without merit.

III

Finally, Appellant Scott contends that during the suppression hearing the district judge treated Scott's counsel so harshly as to render her ineffective, and we review this contention de novo. United States v. Parodi, 703 F.2d 768, 776-78 (4th Cir. 1983).

Contrary to appellant's argument, the Record of the suppression hearing does not suggest that the district court was unduly harsh, or that Scott's counsel was unable to effectively present Scott's defense. Counsel's cross-examinations were vigorous, and counsel did not hes-

13

itate to challenge the trial court's factual findings and legal conclusions.

As an alternative basis for reversing Scott's conviction, appellant argues that the court's treatment of Scott's counsel during the suppression hearing "reflect[ed] a personal prejudice and bias on its face," a "defect which is per se reversible." Appellant's contention is groundless. We have reviewed the transcript of the suppression hearing, and it is unmistakably clear that the district court's denial of the various suppression motions was based on nothing but a rational consideration of the evidence before it.

Accordingly, the district court's treatment of Scott's counsel during the suppression hearing is not a basis for reversing Scott's conviction.

IV

For the foregoing reasons, appellants' convictions are

AFFIRMED.

JACKSON, District Judge, dissenting:

I respectfully dissent from the majority opinion. I believe the District Court erred in its failure to grant the motion to suppress the evidence. The majority opinion reasons that the law enforcement officials had a reasonably articulable suspicion to justify the stop of the vehicle which Decator was driving. The majority concludes that "the fact that the Camry was driving away from 2348 Eutaw Place, the home of a suspected bank robber, was sufficient basis, itself, for the officer's suspicion." In fact, the Camry's departure from 2348 Eutaw Place was the only basis existent at the time of the stop for the officer's suspicion. The government has put forth only two other possible factors for the stop: that the occupants of the car were two Black males, and that one occupant was larger than the other, two characteristics that partially match the descriptions given by witnesses to the robbery. This partial identification, however, is undermined by the testimony of Detective Nick Palmier ("Palmier"), and Detective Frederick Ballard ("Ballard"), who performed the stop.

14

Palmier and Ballard were present in the vicinity of 2348 Eutaw Place as part of the ongoing investigation of the bank robbery. They were specifically looking for the black Toyota pickup used in the crime, as well as two individuals who matched the descriptions given by witnesses at the bank. (App. 35, 175). Palmier testified that he initially observed the car, a green Toyota Camry, entering the alley and parking at 2348 Eutaw Place. (App. 143). This car did not match the description of the getaway vehicle for which the officers were searching. The car was occupied by a single individual-- a Black male. (App. 153-54). Palmier was aware that utility records had placed an individual named Kittrell Decator at the address, and that the black Toyota pickup truck used in the robbery was also registered to a Kittrell Decator. (App. 142). The motor vehicle records had supplied a general description of Decator as a black male, 5' 9" and 140 lbs. (App. 84). Palmier was unable to determine the body type (height, weight) of the driver of the Camry, as he could only observe the driver from the neck up. (App. 156, 176). In fact, the only observation he could make of the driver was that he wore a beard, a characteristic that had not been reported by any witness to the bank robbery. (App. 156). Detective Palmier had the tag on the Camry checked; the car was a leased vehicle registered to an automobile dealer. (App. 144). Other than the driver's race, the Detectives could not connect any detail of either the description given by witnesses to the crime, or the department of motor vehicles information on Kittrell Decator, to the Camry or its occupant. Detective Palmier testified as follows about the decision to stop the vehicle:

> Q So any decision with regard to pulling over that vehicle -- the parking space was no your decision, is that right?
>
> A That vehicle was going to get stop once it left, either by myself or Detective Ballard, sir, yes.
>
> Q Detective Palmier, that was not your decision to make the stop on that vehicle, is that correct?
>
> A I did not stop it, but me and Detective Ballard conferred, and that vehicle was going to be stopped.

(App. 158). Later in his testimony, Palmier stated:

15

Q Okay. And this was not on your order that the vehicle was stopped?

A No, sir. But we did discuss that this vehicle wasn't going to leave without the occupants being identified.

(App. 177). Detective Ballard confirmed that he discussed the Camry with Palmier, and testified that after he conferred with Palmier, he returned to his vehicle in order to be ready when the Camry left 2348 Eutaw Place. (App. 239-40). At the time the officers made the decision to perform the stop,[1] the point in time in which the government must argue the officers had specific, articulable suspicion, the officers were only aware of one individual, of indeterminate size,[2] whose sole identifying feature, his beard, did not match the description given by witnesses to the robbery.

On the basis of this testimony, I am unable to conclude that the officers relied on any part of the description, save that of the race of the driver, when they made their decision to stop the Camry. Racial

_____

[1] Detective Ballard testified that he stopped the Camry on his own initiative, and not upon the orders of Palmier. (App. 248). It is clear from the testimony, however, that the two detectives conferred about the question of whether to stop the Camry, and came to the conclusion that a stop was proper prior to the departure of the Camry from 2348 Eutaw Place.
[2] Palmier does testify that the second Black male was of a heavier build then the first. (App. 144). However, the record fails to explain how Palmier was able to discern this before the stop, as he testified he could only observe occupants of the car from the neck up. (App. 156). He also testified that he was unable to determine the build of the driver. (App. 176). Additionally, at the time Ballard blocked the path of the Camry, Palmier was sitting in his vehicle, unable to see the Camry leave. (App. 248). Palmier observed the actual stop of the vehicle, which now contained two individuals, through his rear view mirror. (App. 144, 158). Detective Ballard did not testify to any observations of the relative size of the individuals at the time of the stop. Neither officer observed the individuals entering the Camry. (App. 158, 239). The government has failed to show that the relative sizes of the individuals were taken into consideration when the stop was performed; in any case, the testimony of Palmier quoted supra makes it clear that the decision to stop the Camry was made before any observation of a passenger in the Camry.

16

characteristics, standing alone, are an impermissible basis upon which to seize and search individuals. <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 885-87 (1975). Therefore, we are left with the sole basis for the stop, and all developments arising out of the stop, being the identification of 2348 Eutaw Place as the residence of the bank robber. Once the officers observed someone driving up to that building, they made the decision to stop that individual with no other reasonable, articulable basis for suspicion.

I believe that there is no factual support for the linchpin to the majority opinion, that is, that the Camry was leaving the home of a suspected bank robber. Evidence contained in the record, as well as excerpts of the testimony from the suppression hearing cast considerable doubt on the majority assumption that the Camry leaving 2348 Eutaw Place, Baltimore City, could be reasonably connected to the individual named Kittrell Decator, whose truck was used in the robbery.

The majority asserts that the black Toyota pickup truck used in the bank robbery had been traced to 2348 Eutaw Place. The record, however, reveals that the truck was registered to two individuals: a Kittrell Decator, a Black male, listed as residing at 4238 Goodson Court, Belcamp, Hartford County, and a Rita Decator Holmes, a Black female, listed as residing at 4815 Melrose Road in Baltimore. (App. 84). These two addresses were investigated; what, if anything, was learned at the addresses is not clear from the record. (App. 34, 84). A search of Baltimore Gas and Electric Company records revealed that a Kittrell Decator had utility services listed in his name at 2348 Eutaw Place, in Baltimore. One would expect that as a matter of prudent investigation, the officers decided to investigate the Eutaw Place address, in addition to the addresses in Hartford County and Melrose Road, despite the fact that the addresses actually listed contained in the truck registration would seemingly have a higher indicia of reliability. The record, however, does not reveal why the investigators focused upon Eutaw Place. The record does show, however, that during their three hours of surveillance over 2348 Eutaw Place, the officers on the scene never took any steps to verify that this was indeed the residence of Kittrell Decator, or that this particular Kittrell Decator was the same individual as that listed on the truck registration, nor did they establish which unit Kittrell Decator lived in. (App. 56, 76,

17

156, 246-47). It is not clear from the testimony of the detectives that performed the stop as to what extent they were aware of the investigation of the two other possible addresses. It does suggest, however, that they were aware that the 2348 Eutaw address had come from sources other than the registration of the getaway vehicle. (App. 142, 240-41). In fact, the record shows that the officers performing the stop were unsure Kittrell Decator lived at the address at all. Detective Ballard testified that one of his purposes in carrying out the stop was to establish "who occupied the house exactly." (App. 249). What is clear from the record is that they were aware that even if Kittrell Decator lived at 2348 Eutaw Place, his was not the only residence at that address.

Detective Ballard, who actually stopped the Camry, testified in part as follows:

> Q This is a neighborhood that's fairly characterized as being predominantly black, is it not, sir?
>
> A Predominantly.
>
> THE COURT: You mean by this the Eutaw Place area?
>
> MR. BERNIER: Yes, sir, Your Honor. Thank you.
>
> Q And is it fair to say that you had an opportunity to look, at least from a general distance, as to what that residence 2348 really is in terms of it -- is it an apartment, could you tell, from where you were as -- that this was an apartment converted building?
>
> A I believed it was an apartment building.
>
> Q Okay. And you knew that --
>
> THE COURT: You believe what?
>
> Q And prior to setting up your surveillance or during the course of your surveillance, were you made aware of whether -- or what apartment Mr. Decator lived in?

18

A No.

Q Had you checked any of the mailboxes or anything like that?

A No, I didn't personally approach the house.

Q Okay. And when this individual backed the car into that parking pad, you did not see him exit, correct?

A That's correct.

Q And you don't know where he entered the building, correct?

A No, I don't.

Q And you don't know what apartment he went into?

A No, I don't.

Q And you did not see him re-exit the building or re-enter the vehicle?

A No, sir.

(App. Pp. 246-47). In referring to 2348 Eutaw Place Detective Palmier, testified "when I drove by it I could see it was like a three-story building." (App. 156). At the time of the stop, this testimony would indicate, the detectives were aware that 2348 Eutaw Place was not a single family residence.[3] They were also aware that they did not know if the driver of the Camry had visited Kittrell Decator's residence, or one of the other apartments in the building. This inability to connect the Camry with Kittrell Decator's residence undermines the authority of Detectives Ballard and Palmier to stop, search, and seize the Camry and its occupants.

_____

[3] These observations are confirmed by Detective O'Hara, who was on the scene but did not participate in the stop of the Camry, who testified that there is "more than one apartment." (App. 77).

19

Terry v. Ohio, 392 U.S. 1 (1968), provided police with the limited authority to "search" and "seize" a person within the meaning of the Fourth Amendment on less than probable cause. However, the law enforcement official who conducts the search or seizure must possess the requisite degree or quantum of suspicion to satisfy the requirements of the Fourth Amendment. That degree of suspicion must be reasonable and based upon articulable, objective facts, together with rational inferences that can be drawn from those facts. When evaluating the reasonable suspicion held by law enforcement personnel at the time of a Terry search or seizure, only the facts and circumstances known to the officer at the time of the stop or search are to be considered.

Here the officers knew that there were three or more bankrobbers, that they were Black, that the getaway vehicle was a black Toyota pickup, and that it was registered to a Kittrell Decator at 4223 Goodson Court, Belcamp, Hartford County, Maryland and a Rita Decator Holmes at 4815 Melrose Road, Baltimore. The police officers also knew that utility records showed a Kittrell Decator with utility service at 2348 Eutaw Place, an apartment building. This information was insufficient to raise an articulable suspicion when the officers, searching for a black Toyota pickup containing two or more Black males, one larger than the other, observed a dark green Camry driven by a single Black male travel slowly down the alley, and back into a parking pad located at the rear of the 2348 Eutaw Place, an apartment building. The car obviously did not match the description of the truck used as a getaway vehicle. The clothing worn by the occupant did not match the robber's clothing as reported. The facial hair of the driver did not match the description of the bank robbers. The detectives had no idea who the driver of the Camry was, and did not have a picture of Decator or any robber. They could not establish the relative height or weight of the driver in order to compare the driver to the information known about Kittrell Decator. They did not see the driver enter the premises under surveillance. They did not determine what apartment the driver entered, or if the apartment he entered was connected to the same Kittrell Decator to whom the getaway vehicle was registered and who was suspected of bank robbery. They did not know who occupied the other apartments, or if the driver of the Camry was the occupant of an apartment other than Mr. Decator's. The officers reported no suspicious behavior on the part of the Camry or its occu-

20

pants, and the individuals made no attempt to evade the officers. Other than the driver's race, they were unable to confirm any aspect of the composite description eye witnesses to the bank robbery had given. This was not a high crime area of town, it was not a suspicious time of day, and it was in an area heavily traveled by Black individuals. (App. 238, 246, 249, 261). On the facts known to the officers on the surveillance, there was nothing unusual about the conduct of a Black male arriving at, and two Black males driving away from, an apartment building in mid afternoon in a Black community in Baltimore five hours after the bank robbery.

It is illustrative to compare the instant case with the situation presented in United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997). In Sprinkle, an officer stopped a vehicle containing two individuals because 1) the vehicle was parked in a high crime neighborhood, 2) he personally knew one of the occupants, and knew he had a history of criminal activity; 3) observed the two occupants in the car act in a manner the policeman interpreted as suspicious, 4) believed the occupant of the car was trying to avoid observation, and 5) the officer believed the driver of the vehicle was attempting to avoid their scrutiny by driving away (although the car left in an objectively normal fashion). In comparison, the instant case involves a stop performed when the only objective fact the officers can assert is that the vehicle and its passengers were in the vicinity of the possible residence of a suspect. Every other objective criteria in the instant case indicated that the individuals in the Camry were not "engaged in illegal activity," the reasonable articulable suspicion of which is required for a Terry stop. Sprinkle, 106 F.3d at 617. Yet while this Court recently found there was insufficient basis for a stop in Sprinkle, 106 F.3d at 618-19, here the majority finds sufficient basis under these seemingly lesser circumstances.

The government has simply not met its burden of proof to establish justification for the alleged stop. When the officers stopped the Camry, they knew only that the car contained two individuals with the same racial characteristics of the robbers but no other similar features that the officers could ascertain. The officers knew these two individuals were leaving in apparently normal circumstances from an apartment building -- an apartment building that might have a resident who might have been involved in a bank robbery that took place ear-

21

lier in the day. At best, stopping these two individuals might be called lucky. After all, it seems only fortunate that the first Black males the officers stopped happened to be the bank robbers.

The description the officers possessed was not sufficiently unique to present a reasonable degree of selectivity from the group of all potential suspects. Therefore, under the information and observations the officers possessed at the time of the stop, any Black males departing the apartment building in question would have satisfied the officers' criteria, and would have been stopped in the same manner. Such a stop would have been in violation of those individuals' rights under the Fourth Amendment. This is precisely the type of "unparticularized suspicion or hunch" that the Supreme Court of the United States has found impermissible. Terry, 392 U.S. at 27; United States v. Sokolow, 490 U.S. 1, 7 (1989).

The government's brief states that "the detectives, seeking to investigate the bank robbery, were anxious to learn the identity of the occupants of the vehicle and whether they had any information concerning Kittrell Decator." The government is arguing that the detectives were trying to gather further information about the apartment building and stopping people who were departing that building for the purpose of developing information. This is supported by the testimony of Detective Ballard, who recognizes that while he and Palmier were aware there was a possibility they might come across Kittrell Decator, his primary purpose in performing the stop was chiefly one of intelligence gathering:

> Q Okay. And I would like you for me to tell me what your belief at the point in time you pulled this vehicle over or you cut this vehicle? What did you seek to gain when you pulled that -- stopped that vehicle from going down the alley?
>
> A I think that the least I could have gained in my mind right now that was the two gentlemen could tell me more about the house.
>
> THE COURT: The two -- to tell you what, sir?

22

THE WITNESS: More about the house and who lived there and who occupied the house exactly. And when I approached, my first thing as an investigator, fugitive investigator is to identify the individual that I'm talking to at the time.

BY MR. BERNIER (CONTINUED):

Q Now this was essentially a flier then. You were taking a shot at seeing -- maybe this was the people you wanted in the car?

A I knew that possibility exists.

Q That's what you were hoping?

A Well, I wasn't hoping that. I knew that that could be a possibility.

(App. 248-49). The problem with stopping individuals simply to ascertain identity because the officer feels the individual might have useful information is that this is legally impermissible. Law enforcement officers are prohibited from "stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity." Brown v. Texas, 443 U.S. 47, 52 (1979) (emphasis added); accord United States v. Hensley, 469 U.S. 221, 232 (1985). If the officers do not have a reasonable, articulable suspicion that the individuals being stopped are about to commit, are committing, or have committed a crime, they cannot be seized. Simply believing they might have useful information cannot justify seizing non-suspects under the Fourth Amendment. Detective Ballard physically blocked the Camry's departure, effectively seizing the individuals. (App. 144, 240-41). See United States v. Grey, 883 F.2d 320, 322 (4th Cir. 1989) (A seizure occurs when the officer uses physical force to restrain the liberty of a person). Terry has long established that police have no right to detain persons against their will absent a reasonable suspicion that they have been involved in or are about to perpetrate a crime. Thus, the desire to get information from residents of 2348 Eutaw Place in no way justifies the stop of the Camry.

23

The officers involved have suggested that when they stopped the Camry to gather information, they believed there was a possibility Kittrell Decator was in the car. (App. 241). Knowing there is some small possibility of stumbling across the robbers, however, is not equivalent to possessing a reasonable, articulable suspicion that the robbers were indeed in the car. I believe, as I have argued supra, that objectively speaking, there was no reasonable, articulable suspicion that Kittrell Decator was in the Camry. However, setting aside for a moment the objective evaluation of the evidence, it is clear from the detectives' own actions and testimony that the two officers directly involved in the decision to seize the Camry did not possess a reasonable suspicion in their own minds that the car contained Kittrell Decator when they decided to perform the stop.

Detectives Ballard and Palmier are experienced law enforcement officers, having served twenty three years and nine and a half years, respectively. (App. 141, 236). Law enforcement officials are quite understandably concerned for their own safety when dealing with criminals or suspected criminals. Ballard testified, for instance, that he was wearing a bulletproof vest. (App. 242). The individuals carrying out the bank robbery had been reported to be heavily armed, perhaps with automatic weapons. (App. 31, 141). Ballard, who physically stopped the Camry, was facing two unknown individuals. (App. 240). The government now asserts, as it must, that Ballard had a reasonable, articulable suspicion that these two men were the bank robbers. Palmier testified that he was trained to pull his gun ninety-nine percent of the time when stopping suspected criminals. (App. 159-60). The government asserts that Detective Palmier had a reasonable, articulable suspicion that the men in the Camry were the bank robbers who had been reported armed and dangerous. However, when these two experienced officers made the decision to stop the Camry, and when they approached the vehicle, both were so confident that the car did not contain Kittrell Decator or any other bank robber that neither of them pulled their weapons. (App. 159-60, 242-43).

This, then, is the question the majority does not address. If the officers performing the stop had so little reasonable, articulable suspicion in their own minds that they were about to stop a criminal, that they took no steps to protect themselves from a potentially lethal situation, how may this Court, after the fact, attribute such reasonable, articul-

24

able suspicion to them? The answer was given by Detective Palmier in his testimony:

> Q Okay. And neither of you had your guns drawn. Is that because you did not believe this to be Mr. Decator in here?
>
> A I did not know that it was him, that's correct.
>
> Q Okay. But that was your suspicion or did you have a suspicion that it was Mr. Decator?
>
> A I just felt that it may not have been him at that time. If I thought for sure it was him, my gun would be drawn, yes, sir.

(App. 177-78). The officers who performed the stop of Mr. Decator and Mr. Jones did not possess a reasonable, articulable suspicion. Detective Palmier has stated so under oath.

Because the initial stop of the Camry violated the Fourth Amendment, the evidence seized from the vehicle, as well as all statements Appellant Decator and Mr. Jones made, are inadmissible. In view of my position on the initial stop, I do not express any position regarding any independent basis for Appellant Scott's arrest. On this record before the court, I would reverse the judgement of the District Court. Therefore, I respectfully dissent.

25