**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                                No. 95-5441

CARL SPRINKLE, a/k/a Carl Sprinkler,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Solomon Blatt, Jr., Senior District Judge.
(CA-94-684)

Argued: September 24, 1996

Decided: February 11, 1997

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Reversed and remanded with instructions by published opinion. Judge
Michael wrote the majority opinion, in which Judge Motz joined.
Judge Niemeyer wrote a separate concurring and dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Albert Peter Shahid, Jr., Assistant United States Attorney,
Charleston, South Carolina, for Appellant. Ann Briks Walsh, Assis-
tant Federal Public Defender, Charleston, South Carolina, for Appel-
lee. **ON BRIEF:** J. Preston Strom, Jr., United States Attorney,
Charleston, South Carolina, for Appellant.

_____

**OPINION**

MICHAEL, Circuit Judge:

Carl Sprinkle was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The police discovered Sprinkle's gun during events immediately following an investigative stop. Sprinkle filed a motion to suppress the gun, arguing that the police did not have reasonable suspicion to make the stop. The district court granted the suppression motion and dismissed the case; the government now appeals. We hold that although no reasonable, articulable suspicion justified the stop, Sprinkle's use of the gun to commit a new, distinct crime after the stop made the gun subject to lawful seizure. We therefore reverse with instructions to reinstate the indictment.

I.

Police officers Daniel Riccio and Holly Ann Connolly work as partners, patrolling downtown Charleston, South Carolina. At 5:30 p.m. on June 24, 1994, the officers escorted a misbehaving (rock-throwing) juvenile to his house on Reed Street, which is in a crowded residential neighborhood. The officers and the juvenile arrived to a busy scene in the Reed Street area: quite a few people were on the sidewalks, and there was no place to park in front of the juvenile's house. The officers, each of whom had a patrol car, parked about a block away. They then delivered the juvenile (and his bicycle) and had a talk with his mother on the front stoop.

While standing on the stoop of the juvenile's house, Officer Riccio noticed Victor Poindexter sitting in the driver's seat of a red Mercury Cougar parked directly across the street about twenty-five feet away. Officer Riccio knew that Poindexter, who was the stepbrother of Riccio's mother, had served time for narcotics violations. Riccio also knew that Poindexter had been out of prison for only a few months, but Riccio had no reports of any criminal activity by Poindexter since his release. The street where Poindexter was parked (and where the juvenile lived) was in a neighborhood known by the police for considerable narcotics trafficking. Riccio himself had made numerous drug arrests in the area.

2

Within a few seconds after Officer Riccio noticed Poindexter, the officers saw Sprinkle, whom they did not know, walk out of a house across the street and get into the passenger side of Poindexter's Cougar. The officers then left the stoop. As they walked by the driver side of the Cougar on the way to their patrol cars, Officer Riccio noticed Sprinkle "huddling and talking to [ ] Poindexter." Specifically, they were "huddled to the center of the console of the vehicle" with their hands "close[ ] together." Riccio "believed that [Sprinkle] was passing or about to pass Poindexter something." When Poindexter saw Officer Riccio, he "put his head down and put his hand to the left side of his face as if to conceal his face from [Riccio] seeing him." At this point Officer Riccio told Officer Connolly, "I know that person [Poindexter], he is involved in illegal activity, narcotics especially. And with [the two men] being in that [high crime] area and the suspicious actions of both . . . we'll probably need to stop that vehicle to conduct an investigation."

Both officers were close to the Cougar as they walked by. It was a "fairly bright day" with "plenty of light," according to Officer Riccio. Officer Connolly could see that Poindexter and Sprinkle were facing each other and talking. Officer Riccio, who was closest, could see inside the car and "saw everybody's hands." Riccio did not see anything in either man's hands. Neither officer saw any drugs, money, guns, or drug paraphernalia in the car. Moreover, Poindexter and Sprinkle did not make any movement that indicated an attempt to conceal any object inside the car.

As the officers hurried on foot to their own cars, Poindexter started the Cougar and pulled into the street. He drove in a normal, unsuspicious fashion; he did not speed, drive erratically, or commit any traffic violations. Once in their own cars the officers intended to pursue and stop Poindexter's car, but some of their work was done for them. Poindexter had driven only 150 feet when an unrelated traffic stop completely blocked his way. Officers Riccio and Connolly simply pulled their cars up behind the Cougar, turned on their blue lights, and walked toward the blocked car. By the time Officer Riccio got to the passenger side of the car, Sprinkle had stepped out. Sprinkle appeared nervous and agitated as Riccio told him he was going to pat him down for weapons. Just as Riccio started the patdown, Sprinkle "pushed away and began to run." After running about one-half block with Ric-

3

cio in pursuit, Sprinkle pulled a handgun from the front of his pants. Riccio, now drawing his own gun, chased Sprinkle for another block and a half, repeatedly ordering Sprinkle to drop his gun. Sprinkle then ran behind a house and paused with his gun still drawn. Riccio dropped to the ground and spotted Sprinkle through the open crawl space under the house. Riccio again ordered Sprinkle to drop his gun. Sprinkle then ran to the front gate of the next house, turned, and fired one shot toward Officer Riccio, who was not hit. Sprinkle "immediately placed the gun to the right side of his head and told [Riccio] that if [he] did not leave him alone that he would shoot himself." After a period of negotiation Sprinkle was persuaded to drop his gun, a .357 Magnum. Sprinkle was placed under arrest, and the police seized the gun.

Later, a federal grand jury indicted Sprinkle for possessing a firearm after conviction for a felony, in violation of 18 U.S.C. § 922(g)(1). Sprinkle moved to suppress evidence of the gun on the ground that it was the fruit of an unlawful stop. After an extensive suppression hearing during which Officers Riccio and Connolly both testified, the district judge granted the suppression motion and dismissed the indictment, concluding that the officers did not have a "reasonable articulable suspicion" to justify the stop. The experienced district judge, who has served for over twenty-five years, could not recall that he had ever before granted a motion to suppress.

The government appeals. We review de novo the ultimate question of reasonable suspicion, but we "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996).

II.

The government first argues that Officers Riccio and Connolly had reasonable suspicion to stop Poindexter and Sprinkle. An investigative detention or stop is constitutional if supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam). Thus, an officer who stops and detains a person for investigative questioning "must be able to point to specific and articulable facts

4

which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). While such a detention does not require probable cause, it does require something more than an "inchoate and unparticularized suspicion or `hunch.'" Id. at 27.

The government says that five facts, taken together, provided Officers Riccio and Connolly the basis for a reasonable suspicion of criminal activity: (1) Officer Riccio knew that Poindexter had a criminal record and had recently been released from prison after serving time for narcotics violations, (2) the subjects were spotted in a neighborhood known by the officers for high (narcotics) crime, (3) when Sprinkle entered the Cougar, he and Poindexter huddled toward the center console with their hands close together, (4) as Officer Riccio walked past the car, Poindexter put his head down and his hand up to his face as if to avoid recognition, and (5) Poindexter drove away as soon as the officers walked by the car. The government is right that in the end we must evaluate the combined strength of these factors, see United States v. Sokolow, 490 U.S. 1, 8-10 (1989), but we will discuss them one by one as we put them into the mix.

Poindexter first got Officer Riccio's attention because the officer knew Poindexter had a criminal record and that he had recently finished a sentence for a drug conviction. Riccio, however, had no information that Poindexter had returned to crime since his release. A prior criminal record "is not, standing alone, sufficient to create reasonable suspicion." United States v. Davis, 94 F.3d 1465, 1469 (10th Cir. 1996). Nevertheless, an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity. See United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994) (collecting cases).

Next, the fact that Officer Riccio spotted Poindexter in a high crime neighborhood at 5:30 p.m. on a sunny day does not provide independent or freestanding grounds for reasonable suspicion. See Brown v. Texas, 443 U.S. 47, 52 (1979); United States v. Perrin, 45 F.3d 869, 873 (4th Cir. 1995) ("Were we to treat the dangerousness of the neighborhood as an independent corroborating factor, we would be, in effect, holding a suspect accountable for factors wholly outside of his control."). Although being seen in a high crime district

5

carries no weight standing alone, "an area's disposition toward criminal activity is an articulable fact," <u>United States v. Moore</u>, 817 F.2d 1105, 1107 (4th Cir. 1987) (citation omitted), that may be considered along with more particularized factors to support a reasonable suspicion.

According to the government the particular acts of suspicious behavior started when Poindexter and Sprinkle huddled toward the center console with their hands close together. When Officer Riccio saw this, he got "the impression that they were in the midst of a narcotics transaction." But it would take more for this impression to qualify as a reasonable suspicion. Here, as Officer Riccio walked by, he could see into the car and see the hands of both men: he saw no drugs, no money, no weapons and no drug paraphernalia. Nor did he see either man try to conceal any object.

When Poindexter saw Officer Riccio, Poindexter raised his hand to the side of his face as if to conceal his identity. Hiding one's face is an act that may be appraised with others in deciding whether suspicion reaches the threshold of reasonableness. <u>See United States v. Tate</u>, 648 F.2d 939, 942 (4th Cir. 1981).**1**

The last factor the government cites as suspicious is that Poindexter started his car and pulled from the curb right after the officers walked by. Evasive conduct can, of course, assist an officer in forming reasonable suspicion. <u>See United States v. Lender</u> , 985 F.2d 151, 154 (4th Cir. 1993) (noting that "[e]vasive conduct, although stopping short of headlong flight, may inform an officer's appraisal of a street-corner encounter"). Here, Poindexter drove off right after his passenger got in the car, and the officers admitted that he drove in a normal, unhurried manner. <u>Compare Tom v. Voida</u>, 963 F.2d 952, 958 (7th Cir. 1992) (distinguishing flight from simple departure from scene),

_____

**1** The district court did not give much weight, if any, to Poindexter's hand movement:

> I don't think [at] five or five-thirty in the afternoon, putting your hand up by your face when your [step-nephew] walks by . . . is going to shield you from somebody that knows you that well. . . . I don't know that putting your hand up is going to shield you that much or if it means anything.

6

with United States v. Sharpe, 470 U.S. 675, 683 n.3 (1985) (using fact that defendant "started speeding as soon as [police] began following" to support finding of reasonable suspicion).**2**

As indicated earlier, "we must consider `the totality of the circumstances -- the whole picture'" in deciding whether the officers had a reasonable suspicion of criminal activity. Sokolow, 490 U.S. at 8 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Officer Riccio's curiosity was understandably aroused when he spotted Poindexter, who had recently served time for a narcotics offense, in a neighborhood with a high incidence of drug traffic. But for these factors to support reasonable suspicion, there must be (other) particularized evidence that indicates criminal activity is afoot. Thus, the government points to the huddling in the center of the car, the face-shielding move, and the driving away. We have already pointed out some of the shortcomings of these factors.

When Poindexter and Sprinkle huddled with their hands close together, Officer Riccio was able to see into the car: he saw their hands, he did not see anything pass between them, and they did not try to conceal any object. In other words, Riccio could actually see that nothing of a criminal nature was happening in the car. Of course, after Officer Riccio looked into the car, Poindexter did try to hide his face. We agree that this appears suspicious. Nevertheless, without some stronger indication of criminal activity, this act cannot tip this case to reasonable suspicion. Nor does the final factor, driving away in a normal, unhurried fashion, lend itself to a finding of reasonable suspicion here. Poindexter's passenger had just gotten into the car, so a prompt departure could be expected. Our conclusion is that the five factors cited by the government gain little, if any, strength when put together. Together, they did not give the officers the necessary reasonable, articulable suspicion of criminal activity. **3** The district court

_____

**2** The district court found that"there wasn't any evasive conduct. They did drive off, but they didn't try to run away or flee or anything [before the initial stop]."
**3** The government has relied heavily, both in the district court and in its brief, on our decision in United States v. Lender, 985 F.2d 151, 154-55 (4th Cir. 1993). The district judge concluded that the Lender case "was

7

was therefore correct to conclude that the initial stop was unjustified. That does not end the matter, however.

III.

The government argues that even if the initial stop was improper, Sprinkle's intervening illegal acts make the gun admissible. Sprinkle counters that his own acts which led to the discovery of the gun were in direct response to illegal police conduct, that is, the stop and attempted patdown. Thus, Sprinkle argues that the gun must be sup-

_____

a lot different" from this one, and we agree that Lender's facts are sufficiently different that it does not compel a finding of reasonable suspicion here. In Lender two policemen were patrolling an area known for heavy drug trafficking. As the police drove across an intersection at 1:00 a.m., they saw three or four men on a street corner huddled around Lender and looking down into his open palm. The police, suspecting a drug deal, stopped their car and got out. We described what happened next as follows: "When the officers tried to approach Lender, he attempted to evade them by turning his back and walking away." Id. at 154. We held that the police had reasonable suspicion to stop Lender, and we upheld the district court's denial of his motion to suppress the evidence seized, a pistol that fell to the ground from his waist when he finally stopped.

Several factors distinguish Lender. First, although the police could not see (from their passing car) into Lender's open hand, the fact that several men were looking to his hand indicated there was actually something in it. Here, although Poindexter and Sprinkle had their hands close together, Officer Riccio was close enough to see that their hands appeared empty. Thus, Riccio's initial suspicion that Sprinkle was about to pass something to Poindexter was simply not confirmed by what Riccio actually saw. Second, Lender engaged in what we considered evasive conduct when he turned his back on the approaching officers and walked away. Here, the district court found that Poindexter, who "didn't pull off in any hurry," was not being evasive. We agree that Poindexter did not appear evasive as he pulled out and drove away. Third, in Lender we determined that the lateness of the hour (1:00 a.m.) properly contributed to reasonable suspicion. In the case before us today, the hour does not weigh in favor of suspicion. Poindexter was parked in broad daylight on a busy street with people all around. In sum, Lender is distinguishable to the point that it is not controlling.

8

pressed as the tainted product of the illegal police action because there are no "intervening circumstances of attenuation to purge the [taint]." Br. of Appellee at 10. See Brown v. Illinois, 422 U.S. 590, 600-04 (1975). Sprinkle's argument, however, overlooks whether his own illegal acts after the initial stop trigger an exception to the exclusionary rule of the "fruit of the poisonous tree" doctrine. We believe they do.

If a suspect's response to an illegal stop "is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime." United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982).[4] There is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest. As the Bailey court recognized, "[a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." Id. Because the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible. See id. at 1018.

_____

[4] Examples of cases where a new and distinct crime purged the taint of any initial police misconduct include Bailey, 691 F.2d at 1012, 1018-19 (assuming that first arrest was illegal, second arrest was legal because defendant, when caught after fleeing, struck DEA agent with his fists and tried to grab the agent's gun during ensuing struggle); United States v. Waupekenay, 973 F.2d 1533, 1537 (10th Cir. 1992) (although police entered suspect's house trailer illegally, suspect commenced new illegal activity when he aimed semi-automatic rifle at police); United States v. Udey, 748 F.2d 1231, 1240 (8th Cir. 1984) (assuming search warrant for house was invalid, when someone inside began shooting, "the house became the scene of a crime committed in the officers' presence"); United States v. King, 724 F.2d 253, 256 (1st Cir. 1984) (assuming attempted search of passenger was illegal, driver's "shooting [at police] was an independent intervening act which purged the taint of the prior illegality"); and United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir. 1971) (whether defendant's first arrest was legal became irrelevant once he committed the subsequent criminal acts of fleeing at 115 m.p.h. and shooting at the sheriff).

We note that these cases were not brought to the attention of the district judge.

9

In this case, Sprinkle fled when Officer Riccio began the patdown. Sprinkle pulled his .357 Magnum as Officer Riccio chased him. After Riccio had pursued Sprinkle about two blocks, Sprinkle took a shot at Riccio. When Sprinkle drew and fired his gun at the officer, he committed a new crime that was distinct from any crime he might have been suspected of at the time of the initial stop. See S.C. Code Ann. § 16-23-410 (Law. Co-op. Supp. 1995) ("It is unlawful for a person to present or point at another person a loaded or unloaded firearm."). At this point, Officer Riccio had probable cause to arrest Sprinkle because the new crime purged the taint of the prior illegal stop. And the gun, which was in plain view at the scene of the new crime, could be legitimately seized.[5]

For the foregoing reasons, we reverse the district court's order that granted Sprinkle's motion to suppress and that dismissed the case. We remand with instructions to reinstate the indictment.

REVERSED AND REMANDED WITH INSTRUCTIONS

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I am pleased to concur in parts I and III of the opinion for the court and I concur in the judgment. Because I would conclude that experienced officers such as those involved here had a reasonable and articulable suspicion that Sprinkle was engaged in criminal activity, and therefore justified in conducting a Terry stop, see United States v. Lender, 985 F.2d 151 (4th Cir. 1993), I dissent from part II.

_____

[5] The government also argues that Sprinkle's flight was an attenuating circumstance. His flight, however, was overshadowed by his drawing and firing the gun, so we would be off the subject to discuss the consequences of flight alone.

10