<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4529**

UNITED STATES OF AMERICA,

            Plaintiff – Appellee,

      v.

NAIM DAWSON,

            Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  Catherine C. Blake, District Judge. (1:06-cr-00106-CCB)

Argued:  October 31, 2008          Decided:  December 31, 2008

Before WILLIAMS, Chief Judge, and TRAXLER and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Jeffrey Michael Brandt, ROBINSON & BRANDT, P.S.C., Covington, Kentucky, for Appellant.  Charles Joseph Peters, Sr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF**: Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Naim Dawson entered a conditional guilty plea to a firearm offense, preserving his right to appeal the district court's denial of his motion to suppress evidence. Dawson relies on four constitutional bases for suppression: (1) that, during his initial encounter with police officers, he was unconstitutionally seized; (2) that there was no probable cause for his subsequent warrantless arrest by those officers; (3) that the officers conducted an unconstitutional warrantless search of his residence and only then decided, based on evidence found, to seek a search warrant; and (4) that the search warrant ultimately secured by the officers was not supported by probable cause and could not be relied on by the officers in good faith. As explained below, we reject Dawson's contentions and affirm.

I.

On March 9, 2006, the grand jury in the District of Maryland indicted Dawson for possession with intent to distribute fifty grams or more of crack cocaine, in contravention of 21 U.S.C. § 841(a)(1) (the "drug offense"), and for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (the "firearm offense"). On October 26, 2006, Dawson filed his motion to suppress evidence, which he thereafter supplemented three times. The district court heard

2

evidence on the suppression motion over the course of three days in January 2007, and it denied the motion by oral ruling of February 1, 2007.[1]

A.

1.

During the evidentiary hearing on the suppression motion, John Jendrek, a detective in the Baltimore City Police Department detailed to the Drug Enforcement Administration ("DEA") Task Force, testified that, in January 2005, the DEA Task Force was in the midst of an ongoing investigation of several Baltimore stores, including the Ayrdale Variety Store, suspected of selling drug paraphernalia.[2] At that time, Jendrek knew that the owner of the Ayrdale Variety Store had previously been convicted of a drug distribution offense, and Jendrek had information — from confidential informants and from numerous

---

[1] The district court followed its February 1, 2007 oral ruling with a February 5, 2007 written order denying Dawson's suppression motion.

[2] According to Detective Jendrek, he had been with the Baltimore City Police Department for fifteen years — the last eight detailed to the DEA Task Force. Jendrek had made more than 500 drug-related arrests, prepared more than 200 search warrants in drug investigations, and testified as an expert on drug investigations some ten to twenty times in state and federal courts. In more than twenty-five of Jendrek's drug investigations, only packaging paraphernalia (such as glass vials or ziplock bags) was initially recovered; but in approximately seventy-five percent of that subset of cases, investigators subsequently recovered illegal drugs.

3

arrestees in other drug cases — about drug paraphernalia (particularly glass vials) being sold at the store. Jendrek explained that the illegal purpose for the glass vials is to package powder and crack cocaine for street distribution, but acknowledged that there are legal purposes for the vials, and that the vials' packaging reflects that they are for storing perfume. Jendrek had never been in the Ayrdale Variety Store, but he could see through the door that it also displayed tee shirts, presumably for sale.

The investigation of the Ayrdale Variety Store included periodic surveillance. Detective Jendrek testified that the officers conducting the surveillance watched for customers who stayed in the store for "a very short period of time" — "not like they were looking around for different items" — and then left with a black plastic bag about "the size of a football" that appeared to have "substantial weight." See J.A. 18-20.[3] Such bags had been shown to contain approximately 500 glass vials each, typically packaged in small cardboard boxes, fifty to a box. Indeed, by January 18, 2005, the officers had stopped Ayrdale Variety Store customers fitting the targeted description

---

[3] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

4

on more than ten occasions, and such customers "always had . . . glass vials." Id. at 22.

On January 18, 2005, a Tuesday, Detective Peter Sullivan was conducting surveillance on the Ayrdale Variety Store, and Detective Jendrek was in his car about a block away. At approximately 12:30 p.m., Sullivan informed Jendrek by radio that he had observed a man — later identified as defendant Dawson, but unknown to the officers at that time — enter and soon thereafter leave the store with a black plastic bag about the size of a football. It was then decided to follow Dawson (who drove off in a Dodge Intrepid with Maryland tags) in the hope that, as in prior cases with other suspects, he would drive to his "stash house" and police could develop probable cause to enter such premises.

Dawson was followed by three officers — Detectives Jendrek, Sullivan, and Keith Gladstone — driving three separate unmarked vehicles. Dawson drove through the Ayrdale Variety Store neighborhood (a residential and small business area in northwestern Baltimore), then headed north on Liberty Heights Avenue/Liberty Road (the main north-south corridor through the area), into Baltimore County and toward Interstate 695 (the Baltimore Beltway). Just south of Interstate 695, Dawson drove into another residential neighborhood and then pulled to the

5

side of the road.  Dawson stopped for about five minutes, without leaving his car.  Jendrek testified that

> this is a technique that, with my experience, drug dealers or drug traffickers often pull to the side of the road to see if anybody is following them, or they will see if the same car may drive past them two or three times, to find out whether someone is trying to, you know, see what they are doing, follow their activities or what have you.

J.A. 31-32.

When Dawson resumed driving, he travelled back through the residential neighborhood to Liberty Road, and then headed south on Liberty back to the city.  At a red light at Callaway Avenue (near the Ayrdale Variety Store), Dawson was stopped next to Detective Sullivan, who, according to Detective Jendrek,

> thought that Mr. Dawson looked at him and kind of shook his head, like acknowledged that [Dawson] knew [Sullivan] was there.  Whether [Dawson] knew [Sullivan] or knew he was a police officer, I don't know, but Detective Sullivan felt that our investigation had been compromised.  He thought Mr. Dawson knew that we were following him.

J.A. 32-33.  Sullivan similarly testified that

> Mr. Dawson looked over at me, stared at me for maybe 15, 20 seconds.  Then when I looked at him, he kind of smiled and nodded at me, and I took that as if, in my opinion and expertise, I took that as if he believed that he had recognized me and figured that I was following him.
>
> . . . .
>
> I told Detective Jendrek and Gladstone that I believed that I had been burnt, which is a term that we use for being noticed as part of the surveillance, and told him that I was going to back off.

6

Id. at 95-96.

Next, Dawson drove across town to the east side of Baltimore, ordered food at a Wendy's drive-through, and then parked in the Wendy's parking lot and ate the food. At that point, DEA Special Agent Bernard Malone joined the surveillance team. Dawson thereafter drove to a spot across from the main entrance to Johns Hopkins Hospital, parking on McElderry Street at its intersection with Wolfe Street. By this time, it was between 1:30 and 2:00 p.m., and the officers had been following Dawson for about an hour. According to Detective Jendrek, McElderry is a public street, and there was a lot of vehicle and foot traffic in the area. Jendrek drove past Dawson, who was getting out of his car. The officers then decided to approach Dawson. Jendrek parked his vehicle on McElderry three spaces away from Dawson's vehicle. Jendrek and Malone — both in plainclothes with firearms concealed (and Jendrek with a visible detective badge on a chain around his neck) — approached Dawson at about the same time. Detectives Sullivan and Gladstone were also in the area, but out of Dawson's sight.

Detective Jendrek and Special Agent Malone met Dawson at the corner of McElderry and Wolfe, across the street from the hospital entrance. According to Jendrek,

> I said to Mr. Dawson, I said can I speak to you? Sir, excuse me, can I talk to you for a minute? He said

7

> yeah, what's going on.  I explained to him that I was a police officer and that I was conducting a narcotics investigation and that I thought he might be involved in narcotics trafficking.
>
> . . . .
>
> He said I don't have anything to do with drugs.  I don't know what his exact words were, but he said he had no involvement with drugs or narcotics.
>
> . . . .
>
> At that time I said, sir, can I have consent to search your person and your vehicle for narcotics, and he said yeah, go ahead.

J.A. 38.  "[E]ither just prior [to] or just after asking" Dawson for consent to search, Malone asked Dawson "for his ID or his driver's license."  Id. at 40-41.  Dawson handed the officers his driver's license, which the officers held for "[m]aybe 30 seconds" prior to Dawson's giving of consent to the search.  Id. at 41.  Jendrek described the initial encounter with Dawson as "very polite."  Id. at 39 ("Mr. Dawson was very, very polite.  We were very polite.  It was not a hostile situation in any way.").  Neither Jendrek nor Malone raised his voice, physically touched Dawson, or blocked or attempted to block Dawson from leaving.  The conversation between Dawson and the officers, up to the point when Dawson gave consent to search, lasted approximately one to two minutes.  During that time, Jendrek

testified, Dawson did not ask to leave or for the return of his driver's license.[4]

Detective Gladstone subsequently joined the group at the corner of McElderry and Wolfe Streets. Detective Jendrek informed Gladstone that Dawson had consented to a search of his car, and Gladstone then searched the vehicle. The officers recovered the black plastic bag, five boxes of glass vials (apparently containing fifty vials each), and five packages of vial stoppers/tops.

Thereafter, Detective Jendrek read Dawson his Miranda warnings and asked him why he had the glass vials. Dawson responded that the vials were for oils, which Jendrek understood to mean perfumes.[5] Jendrek and Special Agent Malone called for a criminal background check on Dawson, using his driver's license (which bore a Gwynn Oak, Maryland address), and learned that Dawson had been convicted in Maryland of two felonies involving controlled substances. Dawson was then arrested for possession

---

[4] Special Agent Malone corroborated details of Detective Jendrek's testimony about the initial encounter with Dawson. See J.A. 105-07. Dawson chose not to testify at the hearing.

[5] According to a later-drafted affidavit in support of the search warrant for Dawson's residence, when Dawson was "asked where the oils were located for the vials[,] he said he didn't have any yet." J.A. 349.

9

of drug paraphernalia in violation of Maryland law and placed in handcuffs.

At some point after the search, around the time of the arrest, Detective Sullivan and Special Agent Paul Neikirk arrived at the scene. Sullivan conducted the search of Dawson's person, which led to the discovery of a receipt in Dawson's wallet with a Baltimore address of 3107 Cresson Avenue, Apartment H. Dawson denied living at that address (a townhouse) or having any contact with it. The officers then drove to the Cresson Avenue townhouse with Dawson, arriving between approximately 2:30 and 3:00 p.m.

2.

The ensuing events are the subject of some dispute between the officers and witnesses for Dawson, including his wife, Monique Dawson, who was working at Johns Hopkins Hospital at the time of Dawson's January 2007 arrest, and Monique's niece, LaToya Cooper, who was residing at that time in the Cresson Avenue townhouse with Dawson, Monique, and their toddler daughter Indigo. It is undisputed, however, that LaToya, then sixteen years old, was alone in the townhouse when the officers arrived there, and that she answered the front door when Detective Jendrek and others knocked on it. Meanwhile, Dawson remained in a vehicle in the driveway with another officer.

10

a.

According to Detective Jendrek, the officers at the front door identified themselves to LaToya, told her they were conducting an investigation, and asked her if they could enter the townhouse and question her.  LaToya permitted the officers inside the residence and agreed to answer their questions. During the questioning, LaToya confirmed that Dawson resided in the townhouse, said that he had left the townhouse that morning, and gave a description of his car that matched the vehicle followed that day by the officers.[6]  Jendrek testified that the officers, who had taken keys from Dawson, then "tried his keys in the door.  Once the keys operated the lock, we secured the location to get a search warrant."  J.A. 222.  When asked by the prosecutor at the hearing if he made "the decision at that point in time to get the search warrant," Jendrek responded, "Yes, sir."  Id.

In describing how a residence is "secured," Detective Jendrek explained that "basically you make sure no one else is home, and anyone who is in that residence is brought down to a common area . . . and . . . detained there [so that she] can't move around and damage any evidence" before a search warrant is

---

[6]  Monique Dawson subsequently corroborated that Dawson resided in the townhouse and had left there that morning before 8:30, when he drove Monique to work at Johns Hopkins Hospital.

11

obtained.  J.A. 224.  In this case, Jendrek and Detective Gladstone directed LaToya to accompany them through the townhouse for a protective sweep.  While looking upstairs for anyone else in the residence, Jendrek testified, he found a firearm in plain view on a shelf in the closet of the master bedroom at the front of the townhouse.  The firearm was left in place, and the trio returned downstairs.  At various points, Detective Sullivan and Special Agent Malone were also in the residence.  Jendrek and Sullivan began preparing a warrant application on their laptop computer in the dining room (between the living room and the kitchen), and LaToya was left in the living room with Malone.  A decision was eventually made for LaToya to call her aunt Monique at work from the house phone; first LaToya, then Gladstone, spoke to Monique.  Jendrek's impression of the conversation was that Monique did not want to come home, but that "Detective Gladstone made it clear that this was an important matter and she needed to come home, back to the location."  J.A. 230.  According to Jendrek, although there was no legal requirement for Monique to be present in the residence, the officers were concerned about being alone there with LaToya, in light of the fact that she was a juvenile.

Monique arrived home approximately thirty to forty-five minutes after the phone call.  By that point, three more officers, including Special Agent Christopher Quaglino, had come

12

to the townhouse. Quaglino, with Special Agent Malone as a witness, spoke to Monique first. Detective Jendrek overheard Quaglino identify himself to Monique, give her Miranda warnings, advise her that she was not under arrest, and ask for her consent to search the residence. According to Jendrek, Monique responded that "she would [give consent], she didn't have anything to hide." J.A. 232. Jendrek further testified, however, that he "actually had no intention of using the consent to search." Id. Jendrek explained that he "believed that Mr. Dawson lived at that location, and he wasn't going to give consent," and that Monique was asked for consent simply as a means "to find out if she knew anything about any contraband that might be in the house." Id.

Thereafter, Detectives Jendrek and Sullivan continued working on the search warrant application on their laptop computer at the dining room table. At some point, Jendrek realized that Monique was on the telephone telling someone that the police were in her house. Jendrek asked her to hang up the phone, but Monique either ignored or did not hear him, so Jendrek pulled the phone from the wall "[a]s a matter of officer safety." J.A. 234. Around 5:30 p.m., once the warrant application was complete, it was printed on the residence's printer and paper. Sullivan drove the application to a state court judge for Baltimore County, and Jendrek left the townhouse

13

to attend to a family matter. Special Agent Quaglino, again with Special Agent Malone as a witness, remained at the premises and took a written statement from Monique. The statement reflected that it was signed at 6:23 p.m.

Shortly thereafter, at 6:30 p.m., the state court judge approved the search warrant. The warrant application spelled out the expertise of Detective Sullivan, who presented the application to the court.[7] The application also included a five-page affidavit detailing the events of earlier that day, including the following: the surveillance conducted on the Ayrdale Variety Store and Dawson; Dawson's suspicious driving pattern; the initial encounter between Dawson and the officers; the search of Dawson's vehicle; Dawson's arrest and the search of his person; the discovery of the receipt bearing the Cresson Avenue address; Dawson's denial of any connection to the

---

[7] According to the warrant application, Detective Sullivan had been with the Baltimore City Police Department for nearly twenty years and was currently assigned to the Narcotics Section of the Organized Crime Division. Sullivan had participated in more than 1000 drug-related arrests, learned about drug distribution methods during debriefings of arrestees, and "recovered substantial quantities of cocaine, cocaine base, heroin, marijuana, and various paraphernalia for the distribution, packaging, and manufacturing of controlled dangerous substances." J.A. 345. Sullivan had also assisted in the preparation of more than fifty search warrants in drug investigations, and had participated in the execution of more than 150 such warrants. Furthermore, he had been qualified as an expert on drug investigations in state and federal courts.

townhouse; the officers' visit to the townhouse and encounters with LaToya and later Monique, who both confirmed that Dawson resided there; the fact that Dawson's key fit the townhouse door; and Dawson's criminal record. According to the affidavit, once the officers confirmed with LaToya that Dawson resided in the townhouse and that his key fit the front door,

> [a]t this point your Affiant believed, based on Naim Dawson's denial of living at 3107 Cresson Avenue and the recovery of the packaging material [i.e., the glass vials], Naim Dawson was utilizing 3107 Cresson Avenue as a stash house to store CDS [controlled dangerous substances] for his CDS enterprise. Your Affiant then secured the location so a search and seizure warrant could be prepared.

J.A. 350. Furthermore, the affidavit asserted that "[i]t has been the experience of your Affiant that CDS distributors transport this CDS paraphernalia . . . from Ayrdale Variety Store to locations (stash houses) where they package large quantities of CDS for street level sale." Id. at 347.

After the officers obtained the search warrant, a search of the townhouse was conducted. During that search, Special Agent Malone retrieved the firearm from the master bedroom closet and brought it downstairs. Notably, Malone corroborated Detective Jendrek's testimony that the firearm was within plain sight upon opening the closet door. The record reflects that a residue-covered mirror was also recovered from the master bedroom (though it is not clear whether it was first observed during the

15

initial protective sweep of the premises), and that a quantity of crack cocaine was found in the townhouse during the warranted search.

b.

By their hearing testimony, LaToya and Monique indicated that the officers had engaged in a pre-warrant search of the townhouse that exceeded the permissible scope of a protective sweep. Monique testified that, after arriving at the townhouse and finding LaToya dressed only in boxer shorts and a tee shirt, she had been permitted to take LaToya upstairs, accompanied by an officer, to retrieve more clothes from the back bedroom. While upstairs, Monique looked into the master bedroom and saw — in contrast to the neat state of the bedroom when she left the townhouse that morning — that there were "clothes, shoe boxes, shoes strewn all over the floor in front of my husband's closet. There was actually a mirror at the foot of my bed with a gun sitting on top of it." J.A. 127. LaToya also testified that the officers had disturbed the master bedroom, leaving the closet door open, throwing clothes on the floor, and leaving items on the bed.

LaToya and Monique also contradicted the officers' version of events in other ways. For example, LaToya testified that she heard keys jingling in the lock of the front door before the officers knocked on it, and that the officers entered the

premises without requesting her permission or explaining why they were there. Monique asserted that the officers falsely informed her, or at least suggested, that they had a warrant to search the townhouse before they had actually obtained one. Monique also testified that she gave consent to search the premises only because she was led to believe the officers already possessed a search warrant.

Finally, LaToya and Monique testified that the officers engaged in abusive behavior toward them by, for instance, using vulgar language and threats of arrest during the phone call to Monique at work. According to Monique, when she arrived home, she found LaToya (who suffers from asthma) visibly upset and hyperventilating, as well as underdressed. Monique described later making two calls from the house phone to arrange care for her toddler daughter, Indigo. During the first call, one of the officers typing on the laptop computer in the dining room — presumably Detective Jendrek or Sullivan — told Monique to "shut the f*** up," because he could not concentrate. J.A. 164. And, during the second call, one of the officers "actually ripped [the phone] from the wall because [Monique] was on the phone crying." Id.

### B.

As set forth above, Dawson's suppression motion rests on four constitutional grounds. First, Dawson contends the

17

officers' conduct during their initial encounter with him amounted to an unconstitutional seizure invalidating his purported consent to search his car. Second, Dawson asserts that, though the officers found glass vials in the vehicle, they did not possess probable cause to arrest him. Third, Dawson maintains that the officers exceeded the scope of a legitimate protective sweep of his residence and only then decided, based on evidence (particularly the firearm) found during the illegal pre-warrant search, to seek a search warrant. And fourth, Dawson asserts that the search warrant was not supported by probable cause and could not be relied on by the officers in good faith, in that the warrant application failed to demonstrate a nexus between his residence and any alleged drug activity.

By its oral ruling of February 1, 2007, the district court rejected each of Dawson's grounds for suppression, concluding (1) that the officers had not seized Dawson for Fourth Amendment purposes before seeking his consent to search his car; (2) that the officers possessed probable cause, in the totality of the circumstances, to arrest Dawson for possession of drug paraphernalia in contravention of Maryland law; (3) that, even if the pre-warrant search of the townhouse exceeded the legitimate scope of a protective sweep, the officers did not rely on the firearm or any other evidence found during such

18

search in seeking the search warrant, thus satisfying the independent source doctrine; and (4) that the search warrant was supported by probable cause, and, even if it was not, the good faith exception would apply. In the circumstances, the court declined to unnecessarily resolve disputed issues about whether the protective sweep was proper, whether LaToya or Monique gave valid consent to search the townhouse, and whether LaToya and Monique accurately described their encounter with the officers.

Following the court's ruling, the parties entered a written plea agreement in which Dawson agreed to plead guilty to the firearm offense, while preserving his right to appeal the denial of his suppression motion, and the government agreed to dismiss the drug offense. The district court accepted the plea and, by its judgment of May 23, 2007, deemed Dawson to be guilty of the firearm offense, dismissed the drug offense on the government's motion, and sentenced Dawson to 210 months of imprisonment. Dawson then timely noted this appeal.

## II.

In an appeal, such as this one, of a district court's ruling on a motion to suppress evidence, we review the court's legal conclusions de novo and its underlying factual findings for clear error. See United States v. Blatstein, 482 F.3d 725, 730 (4th Cir. 2007). We assess each of the four aspects of the

19

district court's ruling — relating to Dawson's initial encounter with the officers, his arrest, the pre-warrant search of his residence, and the subsequent warranted search thereof — in turn.

A.

First, the district court ruled that the officers had not seized Dawson for Fourth Amendment purposes before seeking his consent to search his car, i.e., that the initial encounter between the officers and Dawson was consensual. In so ruling, the court largely relied on our decision in United States v. Weaver, 282 F.3d 302 (4th Cir. 2002). There, we recognized that,

> [g]enerally speaking, a "seizure" warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the "stop," a reasonable person would not feel free to leave or otherwise terminate the encounter. Because the test is an objective one, its proper application is a question of law. Circumstances where the citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual, and therefore do not implicate the Fourth Amendment. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. In applying the totality of the circumstances test, courts look to numerous factors including the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen.

20

Id. at 309-10 (internal citations and quotation marks omitted). We further observed that "numerous courts have noted that the retention of a citizen's identification or other personal property or effects is highly material under the totality of the circumstances analysis." Id. at 310. We refused, however, to deem the retention of identification, such as a driver's license, to be dispositive. Id.; see also United States v. Analla, 975 F.2d 119, 124 (4th Cir. 1992) (observing that there was no seizure where Analla voluntarily provided driver's license and car registration to officer, and officer "necessarily had to keep [the] license and registration for a short time in order to check" them, because "Analla was free . . . to request that his license and registration be returned and to leave the scene").

Engaging in the totality of the circumstances assessment here, the district court made the following findings of fact:

- The encounter occurred in "the middle of the day," at "a busy public area across from the Johns Hopkins Hospital," J.A. 325;

- The officers, Detective Jendrek and Special Agent Malone, "simply parked" their separate vehicles without blocking Dawson's car, id.;

- The officers "walked up to Mr. Dawson and identified themselves," without displaying their firearms or using force of any kind, id. at 325-26;

21

- After Jendrek explained to Dawson that the officers were investigating drug activities and suspected Dawson was involved, and asked Dawson for his identification and consent to search, Dawson provided his driver's license and gave consent to search, see id. at 326;

- The encounter evidently "took [no] more than a minute or two," there were "no handcuffs, no raised voices, no force," and, although Dawson's "license was taken, it was taken only briefly," id.; and

- Dawson "has at least a high school education [and] some familiarity with the criminal justice system," id.

In these circumstances, the court concluded, "this was a consensual encounter between Mr. Dawson and the officers." Id. The court explained that

> [t]here are a number of factors that are to be considered, which I think I have addressed generally, the time, the place, the purpose, the words, the tone of voice and general demeanor. All of these were neutral or innocuous.
>
> There were several officers present, but no display of a weapon, no physical touching.
>
> So I think under the totality of the factors in Weaver, this clearly was consensual and not a basis to suppress any evidence.

Id. at 327-28.[8]

---

[8]    In addition to deeming the initial encounter to be consensual, the district court found that Dawson's consent to search was valid. The court explained that "Mr. Dawson is of reasonable age and intelligence, and not threatened. There is no evidence that he was intoxicated or anything of that kind." J.A. 328-29. Dawson does not challenge this aspect of the district court's ruling on appeal. In his reply brief, however, (Continued)

In our assessment, the court committed no error in ruling that the initial encounter between Dawson and the officers was consensual. With respect to the taking of Dawson's driver's license, we emphasize the court's finding that, like the license and registration in <u>Analla</u>, "it was taken only briefly." J.A. 326.

B.

1.

Next, the district court ruled that the officers possessed probable cause to arrest Dawson for possession of drug paraphernalia in contravention of Maryland law. On this issue, the court recognized that "[t]he probable cause standard" is "an objective standard" that requires "more than bare suspicion, but less than evidence necessary to convict." J.A. 330. Indeed, we have observed that

> [p]robable cause to justify an arrest arises when "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 37 (1979). Probable cause requires more than "bare suspicion" but requires less than evidence necessary

Dawson mentions that, "[a]lthough not directly relevant for this appeal, Mr. Dawson stands by his claim that he did not give consent for the search or did not knowingly consent to the search." Reply Br. of Appellant 7 n.2.

23

> to convict. <u>United States v. Gray</u>, 137 F.3d 765, 769 (4th Cir. 1998). "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." <u>Id.</u> And when it is considered in the light of all the surrounding circumstances, even "seemingly innocent activity" may provide a basis for finding probable cause." <u>Taylor [v. Waters</u>, 81 F.3d 429, 434 (4th Cir. 1996)].

<u>Porterfield v. Lott</u>, 156 F.3d 563, 569 (4th Cir. 1998) (some internal citations omitted) (alteration in original).

In assessing whether there was probable cause to arrest Dawson for a Maryland drug paraphernalia offense, the district court identified the relevant state statute as Maryland Code Annotated, Criminal Law section 5-619, which, under subsection (c), prohibits possession with intent to use drug paraphernalia and deems such conduct to be a misdemeanor. Subsection (a) of the statute lists thirteen factors for a court to consider in determining whether an object constitutes drug paraphernalia. Such factors include "any statement by an owner or a person in control of the object concerning its use," subsection (a)(1); "any prior conviction of an owner or a person in control of the object under a State or federal law relating to a controlled dangerous substance," subsection (a)(2); and "expert testimony concerning use of the object," subsection (a)(13). Subsection (a) also authorizes consideration of "other logically relevant factors."

The district court made the following relevant findings of fact with respect to Dawson's arrest:

- The officers were conducting surveillance on the Ayrdale Variety Store and knew from experience that bags being carried from there of a certain shape and weight, "loosely described as a football size," likely contained multiple boxes of glass vials, J.A. 324;

- On January 18, 2005, a man later identified as Dawson was seen "enter[ing] the store, leav[ing] with a bag of this indicated size and shape, and depart[ing] in a Dodge Intrepid," which the officers followed in separate cars, id. at 324-25;

- Dawson's route, various stops, and encounter with Detective Sullivan "led the officers reasonably to interpret that [Dawson] had been driving in a manner to detect surveillance and, in fact, had detected surveillance, this being behavior that the officers in their experience believed is not unusual for people involved in narcotics dealing," id. at 325;

- The subsequent consented-to search of Dawson's car yielded a bag containing "250 vials and tops," id. at 326-27;

- Such "[v]ials certainly have been recognized as falling in [the section 5-619] definition of paraphernalia," id. at 329;

- After being read his Miranda rights, Dawson told the officers that he had the vials for oils, but "[w]hen he was asked where the oils were, he responded to the effect of not having any," id. at 327; and

- The officers then ran a criminal record check of Dawson and discovered "that he had two prior [state] felony convictions involving controlled dangerous substances, . . . which the officers . . . reasonably interpreted under state law as meaning sufficiently serious to be possession

25

with intent to distribute offenses, as indeed they were," id.

More specifically, the district court considered, pursuant to subsection (a)(1) of section 5-619, Dawson's statement to the officers that his vials were "for oils, although he didn't have any [oils] with him." J.A. 329. The court also considered, as subsection (a)(13) expert testimony, or at least as an "other logically relevant factor[]," the officers' testimony about their experiences with the Ayrdale Variety Store and their reasons for perceiving Dawson's behavior to be indicative of drug trafficking. See id. at 329-30. And, the court considered, under subsection (a)(2), Dawson's two prior state felony convictions on drug offenses, which the court deemed to be "very significant." Id. at 330. The court explained that such convictions "are specifically mentioned as a factor [in the section 5-619(a) analysis] and also obviously make sense in terms of trying to figure out what the intent might be of a particular individual with these empty vials." Id. After analyzing all of these factors together, the court ruled that "the officers had probable cause to make the arrest." Id. That is, "considering the totality of the circumstances, a reasonable officer had probable cause to believe . . . that Mr. Dawson possessed these vials with the intent to use them to store,

26

contain, or conceal [controlled dangerous substances]." Id. at 331.[9]

2.

We conclude that the district court made no error in its ruling, notwithstanding Dawson's contentions to the contrary. In asserting that his arrest was not supported by probable cause, Dawson emphasizes the following: the officers merely "targeted [him] because of the look of the bag he carried out of the store," with "absolutely no way of knowing what [he] purchased"; although the officers "claimed that [he] drove in an evasive manner in order to determine whether he was being followed[,] . . . nothing about his driving violated the law or suggested that [he] might be committing any type of crime"; he eventually parked near Johns Hopkins Hospital where his wife worked, not "in a high-crime area or . . . somewhere [else] to engage in illegal activity"; "he was 'very polite' and cooperated completely with the officers," and "did not act nervously or suspiciously"; and, after the glass vials were

---

[9] The court also observed that, although Dawson's alleged offense "was a misdemeanor, . . . it was committed in [the officers'] presence." J.A. 330; see also United States v. McNeill, 484 F.3d 301, 311 (4th Cir. 2007) (declining to determine "whether the Fourth Amendment contains an 'in the presence' requirement for warrantless misdemeanor arrests [where] the officer who arrested McNeill had probable cause to believe, based on the evidence he witnessed, that McNeill did commit [a] Maryland misdemeanor offense").

27

found in his car, he told the officers, without hesitation, that he planned to use the vials to store oils, which "is exactly what the vials are for, as shown [on their] packaging." Br. of Appellant 24-25. According to Dawson, at the time his arrest, "the officers knew only that [he] (1) had a criminal history as to drug sales, and (2) had in his possession vials that could be used for drug sales but also had a purely legal purpose." Id. at 31. These factors were insufficient, Dawson maintains, to establish probable cause for his arrest. Dawson further contends that his driving was an inappropriate factor in the probable cause determination, because he "was not evasive," "[h]e did not speed or otherwise violate any law or traffic ordinance," and he drove "in a normal, unhurried manner." Id. at 31 n.3 (internal quotation marks omitted).

Simply put, Dawson's version of the facts ignores key findings by the district court — findings well-grounded in the record — and otherwise focuses on irrelevancies. For example, as the district court found, the officers had experience-based reasons to believe that Dawson had purchased glass vials from the Ayrdale Variety Store. Moreover, Dawson's absence from a high-crime area, and his politeness and cooperation with the officers, did not somehow negate his other suspicious behavior. And, the officers were not required to take Dawson at his word that he planned to use the vials for oils, especially in light

28

of his prior state felony drug convictions.  We therefore agree with the district court that the totality of the circumstances — including the officers' experiences investigating the Ayrdale Variety Store, Dawson's apparent efforts to detect surveillance, his lack of a credible explanation for possessing the glass vials, and his criminal record — gave rise to probable cause for Dawson's arrest.  See United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004) (recognizing that, in assessing totality of circumstances surrounding warrantless arrest, it is appropriate to consider, inter alia, "an officer's practical experience and the inferences the officer may draw from that experience").

In so concluding, we explicitly reject Dawson's contention that it was inappropriate to weigh the manner of his driving toward the probable cause determination.  For such contention, Dawson relies on our decision in United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997).  There, we recognized that "[e]vasive conduct can, of course, assist an officer in forming reasonable suspicion" for an investigative stop.  Sprinkle, 106 F.3d at 618.  A Sprinkle defendant drove off "right after the officers walked by," but also "right after his passenger [the second defendant] got in the car" and "in a normal, unhurried manner." Id.  The district court determined "that there wasn't any evasive conduct.  They did drive off, but they didn't try to run away or flee or anything before the initial stop."  Id. at 618

29

n.2 (internal quotation marks and alterations omitted).  We then concluded that "driving away in a normal, unhurried fashion [did not] lend itself to a finding of reasonable suspicion here. [The] passenger had just gotten into the car, so a prompt departure could be expected."  Id. at 618.  Clearly, Sprinkle was concerned with evasive driving as a means to flee police, rendering it inapposite to this matter.  Here, officers surmised that Dawson was driving in order to detect surveillance (and not to flee).  Thus, it makes sense that Dawson obeyed traffic laws; the point is that he was trying to ascertain if he was being followed by police, without giving the officers any reason to stop him.  Accordingly, Dawson's manner of driving was an entirely permissible factor in the probable cause analysis.[10]

---

[10]    Dawson further asserts that, "in the vast majority of state cases involving defendants convicted of violating paraphernalia laws for possessing vials or similar containers, the container contains or is otherwise close to drugs."  Br. of Appellant 27.  According to Dawson, "in a case like this one, where no indication of drugs are found near the vials, the presumption seems to shift to that of a legal use and away from showing any probable cause."  Id. at 28 (emphasis added). Dawson does not, however, cite any authority recognizing or applying such a presumption.  Rather, he simply invokes decisions deeming objects to constitute drug paraphernalia where the objects contain drug residue or are found near drugs, and then extrapolates from there that such evidence is essential, or nearly so, to a finding of probable cause.  As such, we are not persuaded by Dawson's "presumption" argument.

C.

The district court next ruled that, even if the pre-warrant search of Dawson's residence (including the discovery of the firearm) exceeded the legitimate scope of a protective sweep, the independent source doctrine was satisfied. In Murray v. United States, the Supreme Court recognized that "a later, lawful seizure is genuinely independent of an earlier, tainted one" — and the independent source doctrine applies — unless "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." 487 U.S. 533, 542 (1988) (footnote omitted).

Here, according to the district court, "[t]he overall circumstances suggest that there is really no evidence that anything other than the gun and possibly [the] mirror . . . had been found before the search warrant was authorized." J.A. 335. On the issue of whether the officers' decision to seek the search warrant was prompted by what they had found during the pre-warrant search, i.e., the gun or the mirror, the court found "that most likely the [officers] made their decision to seek the warrant before the results of any illegal search and not because of any illegal search." Id. at 339. Indeed, the court observed that the events occurring upon the officers' arrival at the

31

townhouse — including LaToya's statement that Dawson resided there and left only that morning, and the officers' use of Dawson's key to unlock the front door (all in contradiction to Dawson's denial of any connection to the premises) — led the officers to "decide[] to secure the property and get a warrant, believing that there would be narcotics, essentially evidence of what the vials were going to be connected with, in that residence." Id. at 332-33; see also id. at 338 (finding "that there was reason to secure the house, given that the officers were investigating and had . . . spoken with [LaToya], and that's what finally led to the determination that they had probable cause and should get a warrant"). The court concluded that,

> [c]learly, Detective Jendrek and the others believed that there were drugs in the house. They testified to the combination of circumstances that led them to decide to get the warrant. There is no evidence that they had in fact found the narcotics that they believed to be in the house before they started preparing the warrant.

Id. at 339-40. Moreover, on the question of whether information obtained during the pre-warrant search was presented to the state court judge, the district court found that "[t]here was none. That's clear." Id. at 339. Accordingly, the court ruled "that the independent source rule was satisfied in this case." Id. at 340. We agree.

32

D.

Finally, the district court ruled that the search warrant was supported by probable cause, and, even if it was not, the good faith exception would apply.  As we have recognized,

> [w]hen issuing a warrant and making a probable cause determination, judges are to use a "totality of the circumstances analysis."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  This standard "is not defined by bright lines and rigid boundaries.  Instead, the standard allows a magistrate judge to review the facts and circumstances as a whole and make a common sense determination of whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. (David Wayne) Williams, 974 F.2d 480, 481 (4th Cir. 1992) (quoting Gates, 462 U.S. at 238).  The magistrate judge's decision in this regard is one we review with great deference.  Id.

United States v. Grossman, 400 F.3d 212, 217 (4th Cir. 2005). Moreover, the Supreme Court has instructed that "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'"  United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002) (quoting United States v. Leon, 468 U.S. 897, 922 n.23 (1984)).  "[U]nder Leon's good faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'"  United

33

States v. Perez, 393 F.3d 457, 461 (4th Cir. 2004) (quoting Leon, 468 U.S. at 922).

Dawson asserts that the search warrant for his residence was not supported by probable cause and could not be relied on by the officers in good faith, in that the warrant application failed to demonstrate a nexus between the townhouse and any alleged drug activity.  The district court disagreed, observing that

> [t]he evidence that is contained in the affidavit [supporting the warrant application] recites not only the finding of the vials, the evasive driving, the two prior convictions, the experience of the officers, and the likely connection in their experience to vials to a house where narcotics might be found, there is in addition the receipt indicating a connection with Cresson Avenue, Mr. Dawson's denial of a connection to that house, contradicted then by the resident of the house, Miss [LaToya] Cooper, giving [Dawson] a very recent connection to the house that morning, in the same car in which the vials were found, I think making it likely and reasonable for the officers to believe that he was in fact concealing contraband in the house.

J.A. 337-38.[11]  In these circumstances, the court concluded, "the affidavit provides . . . a sufficient reason . . . to think that

---

[11]    Notably, Detective Sullivan's affidavit in support of the warrant application reflects his belief that "Dawson was utilizing 3107 Cresson Avenue as a stash house to store CDS for his CDS enterprise," and asserts that "[i]t has been the experience of your Affiant that CDS distributors transport this CDS paraphernalia . . . from Ayrdale Variety Store to locations (stash houses) where they package large quantities of CDS for street level sale."  J.A. 347, 350.

narcotics might be found at that particular location." Id. at 337. Alternatively, the court ruled that "the good faith exception under Leon would apply, even if there was not probable cause." Id. at 338.

In ruling that the search warrant was supported by probable cause, the court relied on our decision in Grossman, wherein we reiterated the principle that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." 400 F.3d at 218. Indeed,

> [w]e have consistently determined that there was probable cause to support . . . warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes.

United States v. (Darnell) Williams, ___ F.3d ___, No. 08-4014, 2008 WL 5077821, at *7 (4th Cir. Dec. 3, 2008) (citing Grossman, 400 F.3d at 217-18; United States v. Servance, 394 F.3d 222, 230 (4th Cir.), vacated on other grounds, 544 U.S. 1047 (2005); (David Wayne) Williams, 974 F.2d at 481-82; United States v. Suarez, 906 F.2d 977, 984-85 (4th Cir. 1990)). Because the district court similarly did not err in finding probable cause for the warrant to search Dawson's residence, we affirm the probable cause aspect of its ruling without reaching the alternative good faith aspect.

35

III.

Pursuant to the foregoing, we affirm the district court.

AFFIRMED