FILED
07/05/2022
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 7, 2021

**STATE OF TENNESSEE v. DANA BAKER**

**Appeal from the Circuit Court for Madison County**
**No. 20-01     Roy B. Morgan, Jr., Judge**

_____

**No. W2021-00498-CCA-R3-CD**

_____

The defendant, Dana Baker, challenges his Madison County Circuit Court convictions of one count of assault, *see* T.C.A. § 39-13-101(a)(1), and one count of obstructing or preventing the service of process, *see id.* § 39-16-602(c), on grounds that an alleged Fourth Amendment violation prohibited his convictions and that the evidence was insufficient to support his convictions. Because the evidence was insufficient to support either of the defendant's convictions, the convictions are reversed, and the charges are dismissed.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Reversed and Dismissed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J., joined. TIMOTHY L. EASTER, J., filed a dissenting opinion.

Cory Hancock (on appeal) and Mark Donahoe (at trial), Jackson, Tennessee, for the appellant, Dana Baker.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Michelle R. Shirley, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Madison County Grand Jury charged the defendant and his wife, Andrea Baker, with one count of simple assault and one count of obstructing or preventing service of process related to events that took place at their home on June 19, 2019. Evidence presented at the bench trial in this case established that on that date, Jackson Police Department Officers Kelly Mason and Curtis Cozart visited the Bakers' home to serve a criminal summons on Mrs. Baker. Upon arriving at the home, Officer Cozart activated his

body camera to record the encounter. Officer Cozart testified that the body camera footage was unedited and contained a "100 percent" accurate depiction of the events.

The video, which was exhibited to the officer's testimony, showed the defendant and Mrs. Baker sitting in their open garage as Officer Mason and Officer Cozart approached. As he walked toward the garage, Officer Mason held up a sheet of paper and said, "I hate to be the bearer of bad news, but the neighbor is prosecuting." Neither officer stated that they had come to the residence to serve Mrs. Baker with a criminal summons. At that point, the defendant told Mrs. Baker to go inside the house, adding, "[N]obody is leaving this property." Officer Mason warned the defendant not to dictate "what was going to happen." The defendant then walked over to the door leading from the garage into the house and stood in the doorframe. A doorbell was mounted on the frame to the door. Mrs. Baker rose from her chair and walked toward the door. One of the officers stated, "You're not going to jail." Mrs. Baker proceeded into the house and told the officers to leave. Then she and the defendant attempted to shut the door. The officers, instead of leaving, moved swiftly towards the door and, just before the door swung shut, Officer Mason braced the left side of the door with his left forearm and Officer Cozart the right side. After a short struggle, the officers forced their way into the residence, where Mrs. Baker again told them to leave. Instead, they arrested the defendant and Mrs. Baker. After placing the Bakers under arrest, one of the officers mentioned the criminal summons for the first time and stated that they had only come to obtain Mrs. Baker's signature. The officers did not attempt to complete service of the summons after placing Mrs. Baker under arrest.

Officer Cozart testified that after they secured the defendant and Mrs. Baker in handcuffs, he looked at Officer Mason's arm and noticed that it was "very swollen from them trying to shut the door." He testified, "[Officer Mason] couldn't clinch a fist. He was struggling with that. So he had to go to the doctor immediately when we got done." Officer Cozart confirmed that Officer Mason was not injured prior to the encounter.

During cross-examination, Officer Cozart recalled that he had visited the Bakers' residence at least one other time due to a neighbor's calling the police. Officer Cozart admitted that neither he nor Officer Mason ever advised the defendant or Mrs. Baker of the reason for their arrests. When asked why Officer Cozart did not serve the summons on Mrs. Baker after he arrested her, he replied, "If they had given us a chance in the first place it would have already been served." Officer Cozart conceded that Officer Mason would not have been injured had they simply allowed the Bakers to go inside but said that he was "never going to allow the door to close because if the door would have closed, there could have been a possibility for somebody to go get a weapon or anything of that nature." Officer Cozart insisted that although neither the defendant nor Mrs. Baker stated or gave any other indication that they had gone into the residence to obtain a weapon, "We didn't know initially what they were doing." He added, "I mean, they were the ones that were

being aggressive initially."  He acknowledged that there had never been an issue with weapons at this residence in the past.  He admitted that the officers did not have a warrant for Mrs. Baker's arrest and that they only had a criminal summons.  He also admitted that neither he nor Officer Mason mentioned that they were there to serve a criminal summons until after they forced their way into the residence and placed both the defendant and Mrs. Baker under arrest.  Officer Cozart conceded that neither officer asked Mrs. Baker to sign anything at any point and that, as a result, Mrs. Baker did not refuse to sign the summons.  The defendant did not tell Mrs. Baker not to sign anything.

During redirect examination, Officer Cozart insisted that based on his education and experience as a police officer, the Bakers' "furtive movements" put the officers on edge.  Officer Cozart explained that he and Officer Mason pursued the defendant and Mrs. Baker into their home despite that they did not have a warrant because they were unsure of what the pair might do next.  He said that, "when they tried to shut the door injuring my partner, that process took care of itself. . . . I don't have to explain why that took place."

Officer Mason testified that he and Officer Cozart went to the Baker residence to serve a summons on Mrs. Baker and that the defendant "self-injected himself into this whole situation for reasons unknown."  He said that, when the officer attempted "to serve the summons to her, she attempted to flee inside the house and barricade herself."  Officer Mason stated that the officers "proceeded over to the doorway to prevent that from occurring and happening."  As the Bakers attempted to close the door,  Officer Mason "placed my arm upward" to prevent the door from closing.  He testified that, at that point, one of the Bakers, "I believe it was [the defendant] pushed the door forward striking the wood doorframe bar piece into my arm at that point causing injury to my person, which is assault on an officer."  He said that he "then switched my mindset to a fresh pursuit to enter the house and to take them into custody."

Officer Mason testified that he noticed the injury to his arm as he walked back down the driveway and "it felt a little tingly."  He said that, during the search of the defendant's person, he "noticed I couldn't like simply curl my fingers, and . . . then I noticed I started getting like a throbbing pain."  He "looked down at my arm and I had like a huge hematoma on the outside."  At this point, Officer Mason told Officer Cozart that he needed to be driven to the hospital.  Officer Mason's medical records, which were exhibited to his testimony, established that he was diagnosed with a "deep bruise, what they call like a subdural hematoma[.]"  Officer Mason testified that he suffered pain from the injury and that he did not regain "full function of my hand" for "about a day, day and a half."

Officer Mason testified that he arrested the Bakers for "assault and I believe obstruction."  He said that the criminal summons "was served on them at the jail."

During cross-examination, Officer Mason agreed that he had stated in the affidavit of complaint that Mrs. Baker had said, "I'm not signing anything." He conceded, after watching the video footage, that Mrs. Baker had never said any such thing. He insisted, however, that Mrs. Baker's "actions substantiated her trying to evade being served a summons." Officer Mason initially maintained that he had informed the Bakers that the officers were there to serve a summons and that all they needed was Mrs. Baker's signature. After re-watching the video again, however, he acknowledged that he did not, at any point prior to their arrest, tell the Bakers that the officers were there to serve a summons and did not, at any point, ask Mrs. Baker to sign anything. Officer Mason admitted that he did not have a warrant when he forced his way into the Bakers' home. He said that it never crossed his mind to simply serve the summons after entering the house.

During redirect examination, Officer Mason testified that although he did not tell the Bakers that they were there to serve a summons, he did tell them, "You're not going to jail" and that the neighbor "is prosecuting you." He also claimed that he told the defendant why he was being arrested but that the exchange was not included on the video because Officer Cozart wore the body camera and it did not record Officer Mason's audio.

Neither the defendant nor Mrs. Baker elected to testify or put on any other proof. The trial judge found them both guilty as charged. The court imposed a total effective sentence of 11 months and 29 days to be served on community corrections. The defendant filed a timely but unsuccessful motion for new trial followed by a timely appeal. In this appeal, the defendant asserts that the officers committed a Fourth Amendment violation by entering his garage without a warrant. Additionally, the defendant challenges the sufficiency of the evidence to support both of his convictions. The State responds that the defendant's Fourth Amendment claim is waived for failure to raise the issue prior to this appeal. The State also contends that the evidence is sufficient to support the defendant's convictions.

*I. Fourth Amendment Violation*

The defendant contends that Officers Mason and Cozart violated his Fourth Amendment rights by entering his home without a warrant and that the officers' entry could not be supported by exigent circumstances because the officers created any exigency by their own conduct. The State asserts that the defendant waived his constitutional claim by failing to raise it prior to trial.

- 4 -

*Waiver*

The defendant did not file either a motion to suppress or a motion to dismiss based upon any perceived Fourth Amendment violation prior to trial. Tennessee Rule of Criminal Procedure 12(f) requires that all pretrial motions, including motions to suppress evidence or to dismiss a charge on certain grounds, be raised prior to trial or be waived. *See* Tenn. R. Crim. P. 12(b)(3) (motions to suppress evidence classified as pretrial motions); Tenn. R. Crim. P. 12(f). Although the defendant did argue that his Fourth Amendment rights had been violated and asked the trial court to make a ruling whether the garage was part of the curtilage of the home, the record establishes that he did not do so prior to trial and that his challenge was actually more a request for dismissal on grounds that prosecution was essentially barred in light of the violation. To the extent that the defendant's claim was one that had to be raised prior to trial, we hold that it has been waived. Waiver aside, as will we discuss below, the alleged Fourth Amendment violation did not warrant dismissal of the charges.

*Impact of Violation*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "At the very core" of the amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (citation omitted). The "principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest." *Id.* (citation omitted). For this reason, warrantless entry into a residence, in the absence of an exception to the warrant requirement, is presumptively unreasonable, *see id.* at 749, and evidence obtained in violation of Fourth Amendment rights is subject to exclusion, *see generally Mapp v. Ohio*, 367 U.S. 643, 660 (1961).

Officers Mason and Cozart certainly had the right to go to the Baker residence to serve the criminal summons on Mrs. Baker. "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). They also had the right to enter the Bakers' garage given that the garage was open and that both Bakers were sitting facing the street. As noted, a doorbell was located on the interior doorframe. *See Jardines*, 569 U.S. at 8 ("'A license may be implied from the habits of the country,' notwithstanding the 'strict rule of

the English common law as to entry upon a close.'" quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922) (Holmes, J.)); *see also State v. Eddie Leroy Rowlett*, No. M2011-00485-CCA-R3-CD, 2013 WL 749502, at *11 (Tenn. Crim. App., Nashville Feb. 26, 2013) (stating that "[p]olice officers conducting official business have the same rights as members of the general public, and as such they may enter any area of a person's property into which the general public is implicitly invited for purposes of pursuing legitimate business or social interests"). At that point, the defendant was free to end the interaction, ask the officers to leave, and enter his home. *See, e.g.*, *King*, 563 U.S. at 470 (stating that "the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time").

The intrusion beyond the garage into the house is, to be sure, a different matter. Despite the warrant requirement, police may enter a person's home if "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)). That being said, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless" entry into a suspect's residence. *Welsh*, 466 U.S. at 749-50. The Court has been hesitant to find "exigent circumstances, especially when warrantless arrests in the home are at issue," particularly "when the underlying offense for which there is probable cause to arrest is relatively minor." *Id.* Importantly, the police may not circumvent the warrant requirement and enter the home under the auspices of an exigency "created by the law enforcement officer's actions." *State v. Scott*, 619 S.W.3d 196, 207 (Tenn. 2021) (citing *State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005)). Here, no evidence suggested that "the 'urgent need for immediate action'" had "become[] too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." *See State v. Reynolds*, 504 S.W.3d 283, 304 (Tenn. 2016) (quoting *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008)). Neither the defendant nor Mrs. Baker threatened the officers in any way. No evidence supported the officers' claim that the Bakers might have been going into the residence to arm themselves. To the contrary, although the Bakers were clearly upset, both asked the officers to leave and then attempted to retreat into their home. There was no danger of the destruction of evidence, and the crime that was the subject of the criminal summons, criminal trespass, fits the very definition of a "minor offense." Consequently, the officers had no justification for the warrantless entry into the Bakers' home.

The question then becomes, had the issue not been waived, what impact, if any, the Fourth Amendment violation had on the defendant's convictions. That the remedy for a violation of the Fourth Amendment is "the exclusion of such illegally obtained evidence assume[s] implicitly that the remedy does not extend to barring the prosecution altogether." *United States v. Blue*, 384 U.S. 251, 255 (1966). Because Officers Mason and

- 6 -

Cozart violated the defendant's Fourth Amendment rights by entering his home and arresting him without a warrant, the defendant "would at most be entitled to suppress the evidence" obtained as a result of the violation "and its fruits if they were sought to be used against him at trial." *Id.* Here, however, the defendant did not seek suppression of any evidence, and, indeed, no evidence obtained as a result of the Fourth Amendment violation was admitted at trial. *See State v. Abernathy*, 159 S.W.3d 601, 604 (Tenn. Crim. App. 2004) (evidence of a defendant's "criminal conduct committed subsequent to an illegal arrest, or even as a result thereof, should not be suppressible under the exclusionary rule." (citation omitted)).

The Fourth Amendment does not shield the defendant from prosecution for criminal actions he took in the exercise of his constitutional rights. This is true even though the alleged assault was ostensibly the result of the defendant's attempt to exercise his constitutional right to "retreat into his own home." "If a suspect's response to" a constitutional violation "is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime." *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)). To be sure, the defendant had the right to terminate his interaction with the officers, and, under the facts of this case, they had no right to pursue him into his residence. He did not, however, have the right to commit assault in the process. *Cf.* T.C.A. § 39-16-602(b) (stating that "[e]xcept as provided in § 39-11-611, it is no defense to prosecution under" subsection (a) of Code section 39-16-602 "that the stop, frisk, halt arrest or search was unlawful"); § 39-11-611(e) (permitting a person to "resist a halt at a roadblock, arrest, search, or stop and frisk that the person using force knows is being made by a law enforcement officer" only when the "officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and . . . [t]he person using force reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary"). Consequently, even in the absence of waiver, the Fourth Amendment violation did not bar the defendant's convictions.

## *I. Sufficiency*

The defendant contends that the evidence was insufficient to support his convictions. The State asserts that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331

S.W.3d at 379. The verdict of the trier-of-fact resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.* In a bench trial, the trial judge's verdict carries the same weight as a jury verdict. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978).

As charged in this case, "[i]t is an offense for a person to intentionally prevent or obstruct an officer of the state or any other person known to be a civil process server in serving, or attempting to serve or execute, any legal writ or process." T.C.A. § 39-16-602(c). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). "Intentional conduct or an intentional result occurs when the defendant wants to do the act or achieve the criminal objective." *Id.*, Advisory Comm'n Comments.

The evidence adduced at trial established that Officers Mason and Cozart approached the defendant and Mrs. Baker as they sat in their open garage. Officer Mason held up a folded piece of paper and stated, "I hate to be the bearer of bad news, but the neighbor is prosecuting." Neither officer told the Bakers that they were there to serve Mrs. Baker with a criminal summons. Indeed, neither officer ever identified the folded piece of paper as a criminal summons. When the officers entered the garage, the defendant told Mrs. Baker to go inside the house and said, "[N]obody is leaving this property[.]" The defendant then walked into the house via the door connecting the house and the garage and beckoned Mrs. Baker to follow. She did so. Mrs. Baker told the officers to leave, and the Bakers then attempted to close the door to the officers. Without explaining that they were there to serve a criminal summons or to obtain Mrs. Baker's signature, the officers forced their way into the Bakers' residence and placed them both under arrest. Only after the Bakers were under arrest did either officer mention the criminal summons.

In our view, a defendant cannot intentionally prevent or obstruct service of "any legal writ or process" if he does not know that the officer is "attempting to serve . . . any legal writ or process." Holding up a folded piece of paper and saying that a neighbor had elected "to press charges" is not the same thing as communicating that they were there to serve a criminal summons, or any other legal document for that matter. The officers did not ask Mrs. Baker to sign the summons, and consequently she neither signed the summons nor refused to sign it. *See* Tenn. R. Crim. P. 4(g), (h). Neither officer provided any other information, even in response to Mrs. Baker's question, "For what?" Indeed, the officers did not mention the fact that they had a criminal summons or indicate that they were only there to obtain Mrs. Baker's signature on the summons until after they had forced their way

into the house and arrested both Bakers. Additionally, the defendant's simply telling Mrs. Baker to go into the house did not rise to the level of preventing or obstructing the service of process, even if his delivery was rather more vehement than necessary. Moreover, because the officers had no right to enter the Baker residence to serve the summons absent consent to do so, the defendant's action in closing the door to the officers cannot form the basis of a conviction for preventing or obstructing the service of the summons. Finally, the record establishes that the summons was served on Mrs. Baker that same day at the police station. As a result, the evidence did not show that the defendant intentionally prevented or obstructed the service of the criminal summons in this case. In consequence, the evidence did not show that the defendant intentionally prevented or obstructed the service of the criminal summons in this case, and that conviction must be reversed and the charge dismissed.

"A person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another." *Id.* § 39-13-101(a)(1). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." *Id.* § 39-11-106(a)(3). Assault committed "pursuant to Tennessee Code Annotated section 39-13-101(a)(1) is a result-of-conduct offense." *State v. Dorothy Denise Cross*, No. E2013-02133-CCA-R3CD, 2014 WL 4748337, at *4 (Tenn. Crim. App., Knoxville, Sept. 25, 2014)." As a result, here "'[i]ntentional' refers to a person who acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-302(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "'Reckless' refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id.* § 39-11-302(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.*

Because the Fourth Amendment violation did not bar the defendant's conviction of assault, despite that the Fourth Amendment violation unquestionably precipitated the struggle, *see Sprinkle*, 106 F.3d at 619, the assault charge presented a question of fact. At this point, we note that the State relied upon the video recording from Officer Cozart's body camera to establish the essential facts of the offenses, and, as a result, the verdict did not turn on any credibility determination by the trial judge. *See State v. Mitchell*, 343 S.W.3d 381, 392 (Tenn. 2011) (noting that a reviewing court does not use video evidence to undermine the credibility determinations of the trier of fact); *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003) (a reviewing court may use video evidence to determine that a finding of fact was erroneous); *see also State v. Farrar*, 355 S.W.3d 582,

587 (Tenn. Crim. App. 2011) (applying the physical facts rule to determine that video recording belied certain assertions made by witnesses).

As the defendant correctly observes, the video recording from Officer Cozart's body camera does not show that the defendant forcefully closed Officer Mason's arm between the door and the frame. The recording shows the defendant and Mrs. Baker beginning the process of closing the door, which opens to the inside of the house, as Officer Mason rushes to the door. The officer then uses his forearm to push the door from the outside while the defendant and Mrs. Baker brace it from inside the house. The door is not solid but has glass panes separated by mullions. Officer Mason's left arm, the one injured in the kerfuffle, can be seen against the mullion in the paned area nearest the hinge side of the door. Officer Cozart's hand can be seen forcing the door on the knob side. The medical records established that Officer Mason was evaluated and released with a diagnosis of a bruise immediately after his interaction with the Bakers. From this evidence, the trial court could have concluded that Officer Mason's arm was injured during the interaction and that the injury satisfied the definition of "bodily injury."

The evidence does not establish, however, that the defendant acted at least recklessly, much less intentionally or knowingly, in attempting to close the door. *See State v. Binette*, 33 S.W.3d 215, 220 (Tenn. 2000). Our review of the video does not support a conclusion that the defendant attempted to slam the door against the officer in a reckless manner. Instead, the video shows the defendant and Mrs. Baker attempting to close the door in the manner that any person might close the door to an unwanted visitor. As they did so, Officer Mason forcefully braces his left arm against the mullioned portion of the door. Additionally, particularly given that Officer Mason himself was unsure at what point his arm was injured, the evidence does not establish that Officer Mason's injury was the result of the defendant's attempting to close the door and not the officer's own action in attempting to force the door open. "A result-of-conduct offense requires that the culpable mental state accompany the result as opposed to the nature of the conduct." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000) (citing *Wallace v. State*, 763 S.W.2d 628 (Tex. Ct. App. 1989). "The focus is on whether the actor possessed the required culpability to effectuate the result that the legislature has specified." *Ducker*, 27 S.W.3d at 896. Because the evidence did not establish that Officer Mason's injury was actually the result of the defendant's reckless conduct, we reverse the defendant's conviction of assault and dismiss the charge.

*Conclusion*

Based on the foregoing, the judgments of the trial court are reversed, and the charges are dismissed.

_____
JAMES CURWOOD WITT, JR., JUDGE